MELLON BANK, N.A.

v.

AETNA BUSINESS CREDIT,
INC., Appellant.

No. 79–1092.

United States Court of Appeals,
Third Circuit.

Argued Oct. 9, 1979.

Decided March 31, 1980.

1004

Thomas McGanney (argued), White & Case, New York City, William C. O'Neil, David G. Ries, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellant.

Thomas R. Johnson (argued), Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for appellee.

Before ALDISERT and HUNTER, Circuit Judges and CAHN,* District Judge.

** Edward N. Cahn of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

CAHN, District Judge.

This diversity case, tried under Pennsylvania law,[1] involves a contractual dispute between Mellon Bank, N.A., of Pittsburgh, Pennsylvania (Mellon), and Aetna Business Credit, Inc., of East Hartford, Connecticut (Aetna). Both parties are commercial lending institutions. In the context of this case, Mellon is the construction lender and Aetna is the permanent or "take out" lender.[2] Mellon sued Aetna averring that Aetna breached a written contract by refusing to purchase the construction loan held by Mellon. In a nonjury proceeding the district court found Aetna in breach and awarded Mellon damages in the amount of $1,165,731, representing Mellon's loss following foreclosure on the construction loan. Aetna has appealed to this court from the final judgment entered below. The facts, in greater detail, are as follows.

### I. FACTS

Messrs. Opp, Elgin and Wise (the borrowers) were joint venturers in the development and construction of an office complex in the suburbs of Atlanta, Georgia. The project, known as Kensington Square, was to consist of six two-story office buildings. The estimated total cost of the project was $2,500,000.

In May of 1974 Aetna extended to the borrowers a permanent loan commitment in the amount of $2,500,000. The borrowers paid a $50,000 fee to Aetna to bind the commitment which was to remain in force until August 1, 1975. Under the terms of the commitment the borrowers could obtain a six month extension for an additional fee of $25,000.

In June of 1974 Mellon issued a construction loan commitment to the borrowers. In July of 1974 the borrowers, Mellon, and Aetna executed a tripartite Buy-Sell Agreement and related instruments. Upon completion of the project, the Buy-Sell Agreement obligated Aetna, subject to certain conditions, to purchase the construction loan from Mellon. By August 1, 1975, the borrowers' contractor had substantially completed the project and Mellon had advanced $2,241,489 under the construction loan. The work which remained unfinished involved the completion of individual suites to the specifications of prospective tenants. However, earlier in 1975 there had been a precipitous decline in the Atlanta real estate market and the project was only seven percent leased, which placed its economic feasibility in jeopardy.

On August 1, 1975, a Mellon representative met with Aetna's special counsel in Atlanta and delivered closing documents to him. In a letter to Mellon dated August 15,

---

1. In this diversity action we are bound by the law of Pennsylvania, including its conflict of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district court made no specific finding in regard to choice of law. However, the district court applied Pennsylvania law.

 All parties have proceeded at the trial and appellate level as if Pennsylvania law applied to the interpretation of this contract. No objection was raised below or on appeal. At this time we will consider the parties to have waived any objection to the application of Pennsylvania law. *See Bilancia v. G.M.C.*, 538 F.2d 621 (4th Cir. 1976).

2. In *First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Association of Norristown*, 610 F.2d 164 (3d Cir. 1979), Judge Adams outlined the usual method of financing a real estate development as follows:

 As with most real estate developments, the financing here was to take place in two stages: a short-term construction loan and a long-term permanent loan. The construction loan was to finance the actual construction of the project and the permanent loan, or mortgage loan, was designed to replace or 'take out' any short-term borrowings. A permanent loan is generally obtained from a savings institution or insurance company, while a construction lender usually is a commercial bank. A standby commitment obligates the permanent lender to refinance the construction loan if called upon to do so by the developer, but in addition generally provides the borrower with the option to search for an alternative lender with more advantageous terms. The premium paid for this option is a nonrefundable fee, and the commitment enables a developer to seek short term construction financing.
 610 F.2d at 167 (footnote omitted).

1975, Aetna stated that upon Aetna's receipt of sworn statements from the borrowers, representing that they are solvent, "we [Aetna] shall be in a position to fund this loan." On August 27, 1975, Aetna received the executed affidavits of solvency. Two days later Aetna gave notice to Mellon that it would not purchase the construction loan.

The borrowers defaulted on their obligation on September 1, 1975. On October 3, 1975, Mellon declared the construction loan in default. On November 3, 1975, Kensington Square was sold at a foreclosure sale for $1,150,000. Thereafter, Mellon obtained an order from the Superior Court, DeKalb County, Georgia, confirming that the property was sold for its true market value.

Mellon brought suit against Aetna on November 12, 1975, in the United States District Court for the Western District of Pennsylvania. In its complaint Mellon alleged that Aetna had breached the Buy-Sell Agreement by refusing to purchase the construction loan. Mellon claimed damages measured by the difference between the $2,241,489 advanced to the borrowers under the construction loan and the confirmed foreclosure sale price of $1,150,000 plus prejudgment interest and costs.

Aetna's answer denied that all conditions precedent to its take-out commitment had occurred or been performed. Aetna alleged that as a condition precedent to its obligation to purchase the construction loan it was required that the borrowers be solvent. The Buy-Sell Agreement in Section 4 provided that:

> [I]n the event of bankruptcy or insolvency of Borrower the provisions of paragraph 3 of the Permanent Commitment relating thereto shall be applicable.

Aetna drafted paragraph 3 of the Permanent Commitment, insisted that it be incorporated by reference in the Buy-Sell Agreement, and rejected Mellon's attempt to negotiate its deletion. Paragraph 3 stated:

> We [Aetna] shall have no obligation to acquire the construction loan from the

construction lender in the event of bankruptcy or insolvency of the Borrower.

Aetna contended that the borrowers were not solvent at the time it was to purchase the construction loan from Mellon. Also Aetna alleged that there had been material adverse change in the borrowers' condition which negated Aetna's duty to fund the loan. The Permanent Commitment stated:

> [The borrowers] will furnish evidence satisfactory to you [Aetna] at the date of funding that there has been no material adverse change in our financial or other condition . . . from that presented to you [Aetna] for the purpose of considering the loan.[3]

Mellon maintained that the borrowers were not insolvent and that there was no material adverse change in the borrowers' financial condition. Further, Mellon urged that Aetna was not only in breach of the Buy-Sell Agreement, but in breach of a promise contained in the letter of August 15, 1975. That letter stated:

> [W]e agreed to purchase the captioned loan from you upon compliance with all terms and conditions of our commitment. One such condition states that we shall have no obligation to purchase in the event of bankruptcy or insolvency of the borrower. Our funding is, therefore, conditioned upon your submission of sworn statements (in form attached hereto) of each borrower, that each is presently in a solvent condition. Upon receipt of these statements, we shall be in a position to fund this loan.

Record at 336a. The letter was signed by John J. Gillies, an attorney for Aetna. The executed affidavits represented that the borrowers were "presently in a solvent financial condition. My liabilities do not exceed the fair market value of my assets and I am able to pay my debts as they mature." Record at 341a–344a. However, a cover letter from the borrowers' attorneys returned with the affidavits stated:

---

3. Section 8 of the Buy-Sell Agreement provided that "the Permanent Commitment shall remain in full force and effect."

This will further confirm conversation held in your office on August 8, 1975, wherein Mr. Opp advised members of your organization that the current cash flow from his other endeavors would not carry the payments on the Kensington operation until the same is leased. He further advised that the other individuals in the joint venture do not have sufficient cash flow to carry the amount of the loan payments until tenants are acquired.

Record at 339a. The letter also noted that Mr. Opp faced certain contingent liabilities from litigation then pending against him.

The district court, after a bench trial, first found that:

> Aetna's defense in reality boils down to a very thin thread, that is, the issue of whether on August 1, 1975, the borrowers were insolvent. That was an affirmative defense, which Aetna was required to prove by a fair preponderance and has failed to do so.

Record at 75a. Second, the district court concluded that in determining whether or not the borrowers were insolvent the assets and liabilities of the Kensington Square project should be disregarded. Record at 78a. Third, the district court decided that Aetna's failure to purchase the construction loan was in breach of a promise set forth in its letter of August 15, 1975. Finally, the district court held that the act of the borrowers' furnishing evidence to Aetna of no material adverse financial change on their part was not a condition precedent to Aetna's obligation to purchase the construction loan, but merely a promise of the borrower, and that in any event the promise or condition had been fulfilled. The district court entered judgment for Mellon against Aetna in the sum of $1,165,731, which included prejudgment interest.

We determine that the district court incorrectly placed the burden of proof on Aetna to establish the insolvency of the borrowers. Also, the district court should have considered the assets and liabilities of the Kensington Square project in calculating whether or not the borrowers were insolvent. The district court erred in interpreting Aetna's August 15 letter and the return of the borrowers' affidavits either as a separate contractual obligation to purchase the construction loan or as a waiver of the condition that the borrowers not be insolvent. The district court correctly construed the clause in the Permanent Commitment requiring the borrowers to furnish evidence of "no material adverse change in our financial or other condition" to be a promise of the borrowers and not a condition precedent to Aetna's obligation. The case will be remanded for further proceedings in accordance with this opinion.

## II. *BURDEN OF PROOF*

The generally accepted rule is that the burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise.[4] *Standard Alliance Industries v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Ziman v. Employers Fire Insurance Co.*, 493 F.2d 196, 199 (2d Cir. 1974); *Aetna Casualty and Surety Co. v. Harris*, 218 Va. 571, 239 S.E.2d 84, 88 (1977); *Allis Chalmers Manufacturing Co. v. Malan Construction Corp.*, 30 N.Y.2d 225,

---

4. The only general exception to this rule is reflected by the strained reasoning courts utilize to place the burden on an insurance company where the company raises a "condition" in a policy as a defense. *See e. g., Fortress Re, Inc. v. Jefferson Insurance Co.*, 465 F.Supp. 333 (E.D.N.C.1978); *Stortenbecker v. Pottawattamie Mutual Insurance Association*, 191 N.W.2d 709 (S.Ct.Iowa 1971); *Allen v. Ross*, 38 Wis.2d 209, 156 N.W.2d 434 (1968).

All parties and the district court have characterized the insolvency condition as a condition precedent. *See Mellon Bank v. Aetna*, No. 75– 1156 at 7 (W.D.Pa.1978); Brief of Appellee at 21; Brief for Appellant at 6. This is clearly a correct characterization—solvency was a condition which had to exist or occur before a duty of immediate performance of Aetna's promise would arise. *See* Restatement of Contracts § 250; 3A Corbin, Contracts §§ 739–747; 5 Williston, Contracts §§ 666–668. We need not delve into the elusive distinctions between conditions precedent and subsequent. There has been no contention presented that the insolvency clause was or became a condition subsequent.

331 N.Y.S.2d 636, 282 N.E.2d 600, 602 n.5 (1972); *Israel W. Berthiaume's Case*, 328 Mass. 186, 102 N.E.2d 412, 414 (1951); 3A Corbin, Contracts §§ 749–751; 5 Williston, Contracts § 674. The few Pennsylvania cases dealing with the burden of proving a condition precedent also suggest that the burden of proof to establish the condition is on the party alleging the breach. *Dauphin Deposit Trust Co. v. World Mutual Health and Accident Insurance Co.*, 206 Pa.Super. 406, 213 A.2d 116 (1965); [5] *Jennison v. Aacher*, 201 Pa.Super. 583, 193 A.2d 769, 772 (1963); *Bossler v. Poroner*, 29 Pa.Dist. 421, 12 Berks 39 (C.P. Berks County 1919).

■ Therefore, the district court was in error when it placed on Aetna the burden of proving the insolvency of the borrowers as a defense to the action.[6] Mellon had the burden of showing that the borrowers were solvent as a condition precedent to recovery for breach of Aetna's promise.[7]

## III. *INTERPRETATION OF "INSOLVENCY"*

Aetna took the position in their briefs and at oral argument that they are entitled to judgment on the record as a matter of law. The basis for Aetna's position is the wording of the insolvency clause which states that Aetna "shall have no obligation to acquire the construction loan . . . in the event . . . of insolvency of the Borrower." Aetna contends that the test of insolvency is well established in law and as a commercial standard—a party is insolvent when their liabilities exceed their assets or

they are unable to pay their debts as they come due. *See e. g. Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963); 11 U.S.C. § 101(26) (1978); Uniform Commercial Code, 12A Pa.Con.Stat.Ann. § 1–201(23) (Purdons). Aetna contends that documentary evidence establishes the borrowers were insolvent under either of these tests, and therefore, Aetna had no obligation to purchase the construction loan.

Mellon takes the position that the insolvency test must be applied without reference to the liabilities or assets of the borrowers which accrue from the Kensington Square project. Mellon alleges that only this construction of the insolvency clause properly reflects the intent of the parties and is required for a rational interpretation of the Buy-Sell Agreement. Aetna responds to Mellon's position by contending that Mellon's interpretation of the insolvency clause is an impermissible rewriting of the words of the contract.

The district court heard oral testimony, received documentary evidence and concluded that the term insolvency in the context of the Buy-Sell Agreement should be interpreted to exclude reference to assets or liabilities related to the Kensington Square project. The district court held this interpretation was "required by the clear allocation of lending risks between Mellon Bank and Aetna." No. 75–1156, slip. op. at 8. The basis for this holding was not the words of the contract, but evidence extrinsic to it. The district court found that Aetna's loan officer recognized Aetna's principal risk to

---

**5.** This opinion is reported in Atlantic Second under the name of *Peters v. World Mutual Health and Accident Insurance Co.* The difference in names between the official and the West's reporter is unexplained.

**6.** It should be noted that the appellant Aetna was partly responsible for this misapplication of the burden. Mellon correctly pleaded the occurrence of all conditions precedent in its complaint. Record at 5a; *see* Fed.R.Civ.P. 9(c). Aetna properly made a specific denial of the solvency condition. Record at 63a; *see* Fed.R.Civ.P. 9(c). However, Aetna misled the court by incorrectly pleading the nonoccurrence of the condition precedent as an "Affirmative Defense." Record at 64a.

**7.** We do not accept Mellon's argument, made in a supplementary letter brief, that the condition precedent is really a proviso subject to proof by Aetna. *See* 5 Williston, Contracts § 667, pp. 182–183 (1961). Mellon cites no authority for this proposition other than Williston, whose own analysis would probably preclude the application of the proviso doctrine to this situation. *See* 5 Williston, Contracts § 667. There is no Pennsylvania case law in support of Mellon's analysis and all other case law which has been brought to our attention is contrary thereto. *See Kadner v. Shields*, 20 Cal.App.3d 251, 97 Cal.Rptr. 742 (1971).

be whether the office park could reach and maintain a ninety percent occupancy level. The district court found that Aetna in analyzing the security for its permanent loan did not consider the borrowers' cash flow, did not condition its obligation upon any occupancy level, and therefore concluded "Aetna recognized that the financial transaction in question was not a basis for finding insolvency." The district court cited no basis in the contract document or wording of the insolvency clause for its conclusion. Our task is to decide if the district court permissibly used extrinsic evidence to interpret the contract and, if so, whether it drew the proper legal conclusions therefrom.

In this case we confront several familiar, but not necessarily consistent, precepts of contract interpretation. We start from the premise that commercial parties are free to contract as they desire. *Brokers Title Co., Inc. v. St. Paul Fire and Marine Insurance Co.*, 610 F.2d 1174 (3d Cir. 1979). Absent illegality, unconscionableness, fraud, duress, or mistake the parties are bound by the terms of their contract.[8] *Peter J. Mascaro Co. v. Milonas*, 401 Pa. 632, 166 A.2d 15 (1960); *National Cash Register Co. v. Modern Transfer Co.*, 224 Pa.Super. 138, 302 A.2d 486 (1973).

"In construing a contract, a court's paramount consideration is the intent of the parties." *O'Farrell v. Steel City Piping Co.*, —— Pa.Super. ——, 403 A.2d 1319, 1324 (1979). It would be helpful if judges were psychics who could delve into the parties' minds to ascertain their original intent.

However, courts neither claim nor possess psychic power. Therefore, in order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent. As Justice Holmes observed:

> [T]he making of a contract depends not on the agreement of two minds, in one intention, but on the agreement of two sets of external signs—not on the parties' having *meant* the same thing but on their having *said* the same thing.

Holmes, *The Path of the Law, in Collected Legal Papers* 178, as quoted by Judge Friendly in *Frigaliment Importing Co. v. B. N. S. International Sales Corp.*, 190 F.Supp. 116, 117 (S.D.N.Y.1960) (emphasis in original). *See also* Gilmore, *The Death of Contract* (1974).

The strongest external sign of agreement between contracting parties is the words they use in their written contract. Thus, the sanctity of the written words of the contract is embedded in the law of contract interpretation. As it has been variously put:

> [A] court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement.

*National Cash Register Co. v. Modern Transfer Co., Inc.*, 224 Pa.Super. 138, 142, 302 A.2d 486, 488 (1973).

**8.** Illegality, unconscionableness, fraud, duress or mistake are not alleged here. It should be noted that both parties to the Buy-Sell Agreement are commercial entities of great experience and expertise and were represented by counsel in negotiations. Therefore, what we rule in this case is not based on overriding policy concerns that courts sometimes apply to restrict freedom of contract. In the future commercial parties creating loan commitments and buy-sell agreements will negotiate with knowledge of this opinion and will take greater care in expressing their intent. If in the instant case the parties had, with greater clarity, excluded or included the liabilities associated with the Kensington Square project, that would not present public policy difficulties. In this case the court sits with one purpose—to interpret through the use of objective indicia the intent of the contracting parties.

Additionally, it should be noted that we are not dealing with a proceeding in equity. For example, in *First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Association of Norristown*, 610 F.2d 164 (3d Cir. 1979), we considered a situation where a breach of a take out loan commitment had occurred, and the construction lender sought specific performance of the take-out commitment. The consideration of factors such as the allocation of risk between the parties was important in deciding if the court should exercise its discretion to grant equitable remedies.

A court is not authorized to construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation.

*Best v. Realty Management Corp.*, 174 Pa. Super. 326, 329–330, 101 A.2d 438, 440 (1953).

When a written contract is clear and unequivocal, its meaning must be determined by its contents alone.

*East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 230, 205 A.2d 865, 866 (1965).

The rule enunciated in *Gianni v. Russell & Co., Inc.*, [281 Pa. 320, 126 A. 791] supra, is firmly embedded in the law of Pennsylvania and from that rule we will not permit a deviation for it is essential that the integrity of written contracts be maintained. . . . 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: [citing cases]. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract * * * and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence: [citing cases].'

*United Refining Co. v. Jenkins*, 410 Pa. 126, 134, 189 A.2d 574, 578 (1963) (emphasis and citations omitted).[9]

In a world where semantics is a science instead of an art we might be able to read a contract and understand it without question. However, English is often a difficult and elusive language, and certainly not uniform among all who use it. External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms. If each judge simply applied his own linguistic background and experience to the words of a contract, contracting parties would live in a most uncertain environment. Therefore, under Pennsylvania law we are instructed that:

A court must be careful not to 'retire into that lawyers Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair inspect the text, and answer all questions without raising his eyes.

*In Re Estate of Breyer*, 475 Pa. 108, 379 A.2d 1305, 1309 n.5 (1977) (citations omitted), quoting Thayer, *Preliminary Treatise on Evidence* 428, as quoted in 3 Corbin, Contracts § 535 n.16 (1960);

In the construction of any contract, certain principles must guide us: (a) if there is any doubt as to the meaning of a

**9.** Though the concept of the Parole Evidence Rule is relevant here, the issue in this case really concerns an exception to that rule. In the instant case one party introduced extrinsic evidence to "interpret" the contract. The other party argues that this extrinsic evidence seeks to vary or add to the contract and is therefore not admissible. If the written contract is unambiguous, the Parol Evidence Rule and the doctrines cited above bar the use of extrinsic evidence for interpretation. If the written contract is ambiguous the Parole Evidence Rule does not prevent the use of extrinsic evidence to interpret the writing.

This issue of ambiguity must be carefully distinguished from the issue of "integration" which arises when evidence is introduced to vary or add to the unambiguous written terms of a contract on the ground that the evidence is admissible because the written contract is not fully integrated. The issue becomes whether the proffered evidence is extrinsic to the integrated written contract, and thus inadmissible, or whether the proffered evidence is part and parcel of the entire contract of which the written document is only a part.

Though it may be asserted that Pennsylvania courts employ a strict "four corners" approach to issues of integration, we do not believe this approach is required by Pennsylvania decisions in regard to the issue of ambiguity. *See Universal Film Exchange, Inc. v. Viking Theatre Corp.*, 400 Pa. 27, 161 A.2d 610 (1960); *cf. In Re Estate of Breyer*, 475 Pa. 108, 379 A.2d 1305 (1977); *United Refining Co. v Jenkins*, 410 Pa. 126, 138, 189 A.2d 574 (1963). In the case at bar there is no contention that the contract is not fully integrated.

term of a contract, such term should 'receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the [contract] was made'; (b) in construing a contract we seek to ascertain what the parties intended and, in so doing, we consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract; (c) 'However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with that subject-matter, the conventional interpretation would give an unreasonable or absurd result.'

*United Refining Co. v. Jenkins*, 410 Pa. 126, 137–38, 189 A.2d 574, 580 (1963) (citations omitted) (emphasis deleted).

 Courts are left with the difficult issue of determining as a matter of law which category written contract terms fall into—clear or ambiguous. *United Refining Co. v. Jenkins, supra; O'Farrell v. Steel City Piping Co.,* —— Pa.Super. ——, 403 A.2d 1319 (1979).[10] There is a point at which interpretation becomes alteration of the written contract. We must determine if the trial judge went beyond that point.[11]

**10.** Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law. *Broker Title Insurance Co., Inc., v. St. Paul Fire and Marine Insurance Co.,* 610 F.2d 1174 (1979). In the instant case the judge sitting without a jury made findings of fact and reached conclusions of law.

**11.** We could declare our holding in this case, quote the appropriate doctrine, and not explain the approach we feel a court should take on the issue of ambiguity. However, we believe that guidance and standards are necessary in this most difficult area.

**12.** It is only by this approach that courts can achieve consistency in contract interpretation.

A.

Ambiguity is defined as:

Intellectual uncertainty; . . . the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time . . .

Webster's Third New International Dictionary (unabr.1971).

 A court must have a reference point to determine if words may reasonably admit of different meanings. Under a "four corners" approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous. An alternative approach is for the judge to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings. We believe the latter to be the correct approach.

 It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder.[12] *See* Corbin, Contracts § 542.

The strict "four-corners" doctrine allows a court to sit in an isolated position and decide if words are "clear" or "ambiguous." Judges today come from a variety of backgrounds—private law practice, government service, business, academia—and their fields of experience represent an even wider variance. The parties who appear before the court in these times of complex commercial transactions come from a variety of specialized worlds of trade. It is the parties' linguistic reference that is relevant, not the judges'. The judge is in his or her linguistic field of expertise only when viewing words which lawyers have developed as terms of legal art. Even when the judge faces the need to

 An analysis of Pennsylvania cases demonstrates that this approach is in accord with practice in the Pennsylvania courts.[13] Accordingly we conclude that it

interpret legal terms of art, extrinsic evidence and legal briefing are useful.

For example, a contract might provide for a party to pay "$10,000 for 100. ounces of platinum." A judge might state that the quoted words are so clear and unambiguous that parol evidence is not admissible to vary their meaning. That judge might never learn that the parties have a consistent past practice of dealing only in Canadian dollars and follow a standard trade practice of measuring platinum in troy ounces (12 to the pound instead of 16). This is because that judge's linguistic frame of reference includes the dollars and the ounces he or she encounters in daily life. That is not the linguistic frame of reference of the commercial parties.

There are many other examples which demonstrate the necessity of the approach we outline. A "pound" of caviar is always 14 ounces. One can readily see the difficulty counsel might have convincing a judge who never has eaten caviar that a "pound" can be 14 ounces. The case could also come before a judge who was a lifelong gourmet and consumer of caviar. To the gourmet judge it might be "clear and unambiguous" that a pound of caviar is 14 ounces. Similarly, in the lumber business a "two by four" is never really two inches by four inches, but somewhat smaller. The background of some judges might make them aware of this, the background of others might not. Following the approach we outline in this opinion a consistent result could be reached in each case—the parties would be bound to the same meaning of the external signs of their intent. When the judge who knows only common usage is told that a specialized usage can be shown which is common to both parties, he will realize an ambiguity can exist and will admit evidence to determine the meaning by which the parties should be bound. Under a "four-corners" approach to the question of ambiguity, the result would depend on which judge heard the case.

13. Confusion is often caused by the use of the term "ambiguous on its face." See Merriam v. Cedarbrook Realty, Inc., —— Pa.Super. ——, 404 A.2d 398, 401 (1978). A requirement of "facial ambiguity" might mean that a court should look exclusively at the "face" of a contract to determine if words are ambiguous. However, we are not aware of any cases where Pennsylvania courts have construed a writing, declared it unambiguous, and ruled that any consideration of an argument for ambiguity must be disregarded. Much to the contrary, many cases which hold words unambiguous do so only after an examination of circumstances and facts demonstrate that any variation of the words would be an impermissible rewriting of the contract. See e. g. United Refining Co. v.

Jenkins, supra; Merriam v. Cedarbrook Realty, Inc., —— Pa.Super. ——, 404 A.2d 398, 401–402 (1978); Best v. Realty Management Corp., 174 Pa.Super. 326, 101 A.2d 438 (1953). Even given this approach, there will be cases where a claim of ambiguity is virtually impossible, and a failure to proffer an argument for ambiguity in the answer to pleadings or motions might be sufficient to allow a judge to declare terms unambiguous. There is no reason for a court to consider seriously a complaint or argument which seeks to mischaracterize an agreement. See e. g. East Crossroads Center, Inc. v. Mellon-Stuart Company, 416 Pa. 229, 205 A.2d 865 (1965). However, the court must entertain the argument before it can be rejected. The judge should not abandon his legal expertise or knowledge of the English language. We only assert that the judge's own semantic expertise does not stand sacrosanct against a reasonable alternative semantic reference presented by the parties. If no "reasonable" alternative meanings are put forth, then the writing will be enforced as the judge reads it on its "face." See International Systems, Inc. v. Personnel Data Systems, slip. op. (Pa.Supreme Ct. Jan. 18, 1980).

An illuminating example of the approach of the Pennsylvania courts is the case of United Refining Co. v. Jenkins, 410 Pa. 126, 189 A.2d 574 (1963). This case was divided into two parts, a suit on a note (United v. Jenkins) and a counterclaim on an oil sale contract (Jenkins v. United). The basis of the claim in United v. Jenkins was a note which provided:

> December 31, 1957 after date I promise to pay the order of United Refining Company Ten Thousand Dollars . . . with interest at 5 per cent per annum.

The trial court had admitted extrinsic evidence on behalf of Jenkins to show that the sole source of payment of the note was to be proceeds from property involved in another agreement between United and Jenkins. Jenkins contended that the note was part and parcel of the oil sale agreement between United and Jenkins and that therefore the proffered interpretation was a permissible interpretation of the note. The Pennsylvania Supreme Court ruled that this note was clear and unequivocal and could not be varied by parol evidence. "The contract is absolute and complete on its face and sufficiently comprehensive to embody the aim and object of the parties." 410 Pa. at 134, 189 A.2d at 578, quoting Speier v. Michelson, 303 Pa. 66, 70–71 (1931). Judgment was entered for United.

The basis of the counterclaim was the same oil purchase agreement which Jenkins had claimed was integrated with the note in United v. Jenkins, under this purchase agreement

was proper for the court here to consider extrinsic evidence.

### B.

 But our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation. Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent. Generally parties will be held to definitions given to words in specialized commercial and trade areas in which they deal. Similarly, certain words attain binding definition as legal terms of art. *See e. g. Brockett v. Carnes*, slip. op. (Pa.Super.Ct.Dec. 19, 1979). Dates, numbers and the like generally cannot be varied. *See e. g. O'Farrell v. Steel Piping Co., supra.*[14] For example, extrinsic evidence may be used to show that "Ten Dollars paid on January 5, 1980," meant ten Canadian dollars, but it would not be allowed to show the parties meant twenty dollars. Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent.[15]

 We have concluded that the district court here exceeded the permissible boundary of interpretation. We believe its interpretation of insolvency was improperly restrictive. Commercial parties entered a Buy-Sell Agreement using a well defined commercial term and legal term of art— "insolvent." The court rejected the test which we believe an attorney or commercial creditor would use to determine if the borrowers were insolvent in any other context, and instead substituted a test for insolvency which excluded certain liabilities of the borrowers. This variation of the written words used in the contract was not justified by the evidence received. When the district judge received Mellon's evidence it should have rejected it as insufficient to vary the meaning of a commercial term as well established as "insolvent." In this case the district court added a term which made the condition a nullity. It ruled that, although the solvency of the borrowers was a condi-

---

United agreed to purchase and Jenkins agreed to sell all the crude oil produced by Jenkins. The agreement provided that it was to continue in force "so long as there remains unpaid any indebtedness and interest thereon of [Jenkins] to [United]." Jenkins argued that the clause meant what it said—that as long as a debt was outstanding, the agreement was in force. United argued that it would be irrational to construe the words in such a way that the obligation remained in effect even if the debts Jenkins owed United were in default. The Pennsylvania Supreme Court agreed with United and the counterclaim was dismissed. This cause was held to be ambiguous and was interpreted rationally in accord with all the circumstances and negotiations of the parties.

It is beyond argument that the clause in issue in the counterclaim by Jenkins was not ambiguous on its face. The words "so long as" have a clear meaning. The words "there remains unpaid" have no facial ambiguity. The meaning of the words "any indebtedness and interest thereon" were not in dispute. They referred to the note Jenkins owed United. It was this very note which the court ruled in *United v. Jenkins* was not "part and parcel" of the oil purchase plan, but a separate integrated contract. There were no facially inconsistent words in the con-

tract. Why then did the court allow United to add the condition that made the clause which was written "so long as there remains unpaid any indebtedness and interest thereon of [Jenkins] to [United]" read "so long as there remains unpaid any indebtedness and interest thereon of [Jenkins] to [United] *which is not in default*"? The reasons are clear—from an examination of external signs and objective indicia this was the only rational interpretation of the parties intent. The court had made detailed examination of the evidence offered on the claim and the counterclaim. The evidence on the counterclaim was so compelling that the inference was permissible. However, there was no similar evidence of a compelling nature presented by Jenkins in the action on the note. Interpretation of the note as written was not irrational.

**14.** *But see* the "two by four" example given at note 12, *supra*.

**15.** There could still be proof of fraud, duress, mistake or subsequent oral modification to vary the term used. *See F. D. I. C. v. Barness*, No. 78–100, slip op. at 20–21 (Pa.Super.Ct.Jan. 31, 1980). *See* note 9, supra.

tion in the written contract, the fact that the borrowers' solvency was not significantly considered by Aetna in evaluating the take-out loan minimized or nullified this clause of the contract.

The condition that the borrowers not be insolvent was added by Aetna and retained in the contract over Mellon's protests. The fact that the insolvency of the borrowers was not significantly considered by Aetna in evaluating the take-out loan is immaterial given the expression of that concern in the written words of the contract. The fact that Aetna thought it bore some risk of default if the occupancy rate of the project fell too low was not sufficient to vary the normal commercial meaning of the word "insolvent." Of course Aetna bore some risk of default—Aetna's funding obligation extended over a ten year period. There was no substantial evidence for Mellon's interpretation of the contract other than evidence tending to show that Aetna was not significantly concerned with the borrowers' solvency until they desired an "out" to excuse their obligation to purchase a loan which had become unsound. Fortunately for Aetna it retained that "out" in the Buy-Sell Agreement despite specific objections from Mellon. See Testimony of De-Luca, Record at 515a–518a. At best, Mellon's officers admitted that they knew the insolvency clause was adverse to Mellon's interests, but they didn't "really" know what it meant. Testimony of DeLuca, Record at 518a. Mellon's evidence was simply insufficient to vary the clear meaning of the commercial term "insolvent."

## C.

Our holding the parties to a generally accepted commercial interpretation of the word "insolvency" in no way produces an irrational result. Aetna was to undertake the risk of a decline in the real estate market for ten years after it purchased the construction loan. Mellon was at risk of construction not being completed on time and within cost. The issue is who bore the risk that the borrowers' financial reserves could not carry the project from the date of the Buy-Sell Agreement to the closing on the permanent financing—i. e. who bore the risk of a decline in the Atlanta real estate market from July of 1974 to August of 1975. It is not irrational to place that risk on Mellon, nor is it irrational to place it on Aetna.[16] Aetna inserted the insolvency clause in the commitment. Mellon demanded that the clause be excluded from the Buy-Sell Agreement. Aetna refused. When Mellon signed the agreement notwithstanding the inclusion of the clause, it became bound by the usual meaning of insolvency. This result is not irrational and therefore does not compel the alternative meaning of insolvency suggested by Mellon. Mellon cannot now insert an exception to the solvency condition. "Where one of two innocent persons must sustain a loss, the law will place that burden on the party that has agreed to sustain it." *F. J. Busse, Inc. v. Department of General Services*, ⸺ Pa. Cmwlth. ⸺, ⸺, 408 A.2d 578, 580 (1979). *See International Systems, Inc. v. Personnel Data Systems*, slip. op. (Pa. Superior Ct., Jan. 18, 1980).

 Accordingly, we conclude that in determining the insolvency of the borrowers the district court must include all the assets and liabilities of the borrowers in applying both generally accepted commercial tests for insolvency. The notion of insolvency is measured both by a balance sheet showing all assets and liabilities and the test of whether one can meet current debts as persons engaged in a trade normally do.[17]

---

**16.** Mellon cannot deny that such a decline in real estate value was a risk it at least partially bore—Mellon took a mortgage on the Kensington property as security for its construction loan.

**17.** The issue is if the borrowers were solvent on the day the duty to fund would otherwise

arise—August 1, 1975. A determination of solvency requires a factual review of the borrowers' financial condition and the application of complex and sometimes conflicting accounting practices and valuation theories. Although the definition of solvency on the surface appears simple, the factual finding of its existence may

## IV. THE LETTER OF AUGUST 15, 1975

We find it necessary to respond to Mellon's alternative argument that notwithstanding the presence of the insolvency clause in the contract, Aetna waived any defense based on this clause by its letter of August 15, 1975. We believe that the letter of August 15, 1975, and the borrowers' affidavits of solvency submitted in response to that letter do not establish a separate contract obligating Aetna to purchase the construction loan nor do they constitute a waiver of the condition that the borrowers not be insolvent at the time Aetna would otherwise become obligated to purchase the loan. We are unable to perceive how this letter could be construed as an offer by Aetna to waive any of Aetna's contractual rights under the insolvency clause. This very letter reasserted Aetna's rights under that clause, reminded the borrowers that their solvency was a required condition precedent to funding the permanent loan, and asked for "sworn statements" to assure Aetna that the condition was fulfilled. The letter never unequivocally stated that Aetna would fund the loan upon submission of the statements, but only that Aetna would "be in a position" to fund the loan. In the context of complex commercial dealings courts must be careful not to take single acts or isolated correspondence out of the context of the entire situation and construe them as separate contracts or waivers of important contract rights unless such an intent is explicitly and clearly expressed.

When Aetna requested affidavits they were asking for sworn truthful statements of the borrowers' solvency.[18] If the borrowers were insolvent when they signed affidavits swearing that they were solvent, then the return of those affidavits did not consummate a contract since the act of acceptance was not in conformity with the offer. If the affidavits were signed truthfully, then the letter and affidavits merely evidence that the condition of solvency was satisfied.[19] In reality, the letter of August 15 was an attempt by Aetna to determine if the insolvency condition was fulfilled.

In addition, the cover letter which was returned with the affidavits and signed by the borrowers' attorney can be said to have derogated the contents of the affidavits. An acceptance must be unequivocal to be valid. In Re ABC–Federal Oil and Burner Co., 182 F.Supp. 928 (E.D.Pa.1960), aff'd 290 F.2d 886 (3d Cir. 1961); Hedden v. Lupinsky, 405 Pa. 609, 176 A.2d 406 (1962).

## V. MATERIAL ADVERSE CHANGE

The district court determined that the material adverse change clause was not a condition precedent to Aetna's obligation to buy the construction loan. First, the district court noted that paragraph four of the Buy-Sell Agreement contained an extensive list of conditions precedent to Aetna's obligations. The material adverse change clause was not in that paragraph. Normally this might be probative evidence that the material adverse change clause was not a condition precedent. However, the material adverse change clause was in a totally different document, which preceded the Buy-Sell Agreement. The material adverse change clause was contained in the Loan Application, which in turn became part of the Permanent Commitment, which as previously noted, became part of the Buy-Sell Agreement by incorporation. Therefore, the fact that such a clause was not in paragraph four of the Buy-Sell Agreement does not by itself support the district court's conclusion that the material adverse change clause was not a condition precedent to Aetna's obligation. The insol-

present difficulties which should be resolved by the trial court.

18. As a matter of judicial integrity and public policy the court would not enforce a contract requiring submission of perjured affidavits. In any event, it could not be argued here that Aetna, when requesting "sworn" affidavits, wanted anything less than truthful statements.

19. We need not determine what the effect might be if the borrowers signed the affidavits truthfully but were unaware of their own insolvency. The cover letter returned with the letters makes clear that all parties were aware that the major borrower, Mr. Opp, could not meet his obligations in connection with the Kensington Square project.

vency condition also was not in paragraph four, but in the Permanent Loan Commitment.

The district court also held that the insolvency clause was not a condition precedent to Aetna's obligation based on the language of the clause. The clause stated:

> If the application is approved, we [the borrowers] agree to the following: . . we [the borrowers] will furnish evidence satisfactory to you [Aetna] at the date of funding that there has been no material adverse change in our financial or other condition. . . .

Record at 29a.

 The rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise or covenant. Language not clearly written as a condition precedent is presumed not to be, unless the contrary clearly appears to be the intention of the parties. *Britex Waste Co. v. Nahar Schwab and Sons*, 139 Pa.Super. 474, 12 A.2d 473 (1940); *Potts Mfg. Co. v. Lofredo*, 96 Dauph. 413 (Ct. of Common Pleas), *aff'd*, 235 Pa.Super. 294, 340 A.2d 468 (1974); *Sharp v. McKelvey*, 57 Lanc.Rev. 377, *exceptions dismissed*, 57 Lanc.Rev. 391, *aff'd* 196 Pa.Super. 138, 172 A.2d 580 (1961). We hold that it was not error for the district court to construe the material adverse change clause as a promise of the borrowers, and as consideration for Aetna's promise and not a condition precedent to Aetna's obligation. It was also not error for the district judge to hold that this clause was fulfilled. Aetna required no more information than they received, and expressed no dissatisfaction with this information. Aetna added the insolvency/bankruptcy condition in the acceptance of the application which already contained the material adverse change clause. It is a rational interpretation to view the insolvency clause as addressing Aetna's concerns about the borrowers' financial condition because it viewed the material adverse change clause as insufficient to cover the same potential problems. The material adverse change clause was the procedural way Aetna was to receive information about the financial status of the borrowers. Unless the borrowers and Mellon were in substantial non-compliance with their obligations under the Buy-Sell Agreement/Permanent Loan Commitment, Aetna was limited to the insolvency condition as a ground for refusing to purchase the construction loan.

## VI. CONCLUSION

On remand the district court should place the burden of proof on Mellon to establish the condition precedent that the borrowers were not insolvent as of August 1, 1975. The district court should include the liabilities of the Kensington Square project in deciding whether or not the borrowers were then insolvent. Aetna's letter of August 15, 1975, and the response thereto do not constitute a valid waiver of the condition precedent nor do they create a separate contract obliging Aetna to purchase the construction loan.[20]

The judgment of the district court will be vacated and the cause remanded for proceedings consistent with the foregoing.

---

**20.** We need not reach the issue of Mellon's entitlement to prejudgment interest.