866 F.2d 641
 130 L.R.R.M. (BNA) 2528, 110 Lab.Cas. P 10,933
 INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS,
AFL-CIO, Charles W. Jones, Donald Whan
and Henry Harden, Appellants in 88-1379,
v.
LOCAL LODGE D504, et al. International Brotherhood of
Boilermakers, Iron Ship Builders, Blacksmiths,
Forgers and Helpers, AFL-CIO.
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL-CIO, et al.
v.
LOCAL LODGE D504, et al. Local Lodge D17, Gary Marositz,
Richard Gross, James Begies, Local Lodge D54, George Mayer,
Alexander Szoke, Local Lodge D376, Ruel Oswald, Robert
Vogel, Jeffrey Fenstenmachaer, Local Lodge D504, Wilfred
Brumbaugh, Norman Hoover, Robert Burk, Local Lodge D547,
Richard Yelles, Wainwright Beal, Ronald Silfies, Local Lodge
D554, Barry Silfies, Robert Csencitz, and Independent
Workers of North America, Appellants in 88-1395.
 Nos. 88-1379, 88-1395.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 2, 1988.
Decided Feb. 1, 1989.
Rehearing and Rehearing In Banc Denied March 1, 1989.
 
 Bruce E. Endy (argued), Spear, Wilderman, Sigmond, Borish, Endy & Silverstein, Philadelphia, Pa., for appellants-cross appellees.
 Michael N. Katz (argued), Lynne P. Fox, Meranze and Katz, Philadelphia, Pa., for appellees-cross appellants.
 Before SEITZ, STAPLETON and COWEN, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 This appeal arises from an order of the district court denying plaintiffs' claims against six Local Lodges and their officers in a dispute over ownership of the Local Lodge treasuries. After a bench trial, the court issued an order holding that the defendant Locals are entitled to retain their treasuries. The order further directed that judgment be entered in favor of the plaintiffs and against the Local Lodges and their officers for unpaid per capita taxes until the date of NLRB certification of a rival union, the IWNA. Finally, the court entered judgment against the IWNA for tortious interference with the obligation of the Local Lodges to pay per capita taxes to the plaintiffs.
 
 
 2
 Upon review, we will reverse the district court's determination that the Local Lodges are entitled to retain their treasuries. We will affirm the court's ruling that the Local Lodges are required to pay a per capita tax until the date of the NLRB certification of the IWNA. Finally, we will affirm the district court's determination pertaining to plaintiff's claims of alleged tortious interference under section 301 of the Labor Management Relations Act.
 
 I.
 
 3
 This case consists of six cases which have been consolidated for pretrial, trial and post-trial purposes. The main plaintiff in these cases is the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers ("Boilermakers").[1] The Boilermakers is an unincorporated labor organization within the meaning of section 2(5) of the National Labor Relations Act ("NLRA"). The defendants are six local unions and their officers, including the named defendant, Local Lodge D504 as well as Local Lodges formerly known as D17, D54, D554, D376 and D547 ("Locals").[2] In the six complaints, the Boilermakers claim entitlement to all books, records, properties funds and assets currently held by the Locals.
 
 
 4
 In 1983, the Boilermakers began discussions with the Cement, Lime, Gypsum and Allied Workers International Union ("Cement Union") concerning a possible merger of the two organizations.[3] Merger negotiations were conducted for a period of approximately two years before a final Merger Agreement came to fruition on April 1, 1984. App. at 2580.
 
 
 5
 The dispute over the treasuries began following the Locals' disaffiliation from the Boilermakers. The events leading to the disaffiliation began with the first Consolidated Convention following the merger which was held in August of 1986. At that convention, there was disagreement over who was eligible to vote for the International vice president. As a result of a decision against restricting eligible voters to the Cement Division of the Boilermakers, the former Cement Union president, Richard Northrip, was not elected to a vice presidency of the Boilermakers. Northrip and those who supported him then formed the Independent Workers of North America ("IWNA"). The IWNA sought to become the bargaining agent for Boilermaker Local Lodges which formerly were Local Unions in the Cement Union.
 
 
 6
 Prompted by the defeat of the Cement Union's candidate for the International Vice-President at-large of the Boilermakers, the members of each defendant Local Lodge held an internal vote and in each case, the members voted to disaffiliate from the Boilermakers.[4] Many of the former Cement Union employees then joined the rival IWNA. Between November 4, 1986 and February 9, 1987, the IWNA filed six petitions with the National Labor Relations Board ("NLRB") seeking elections for certification of a new bargaining representative at locations where a Boilermakers' Local Lodge was currently certified as the bargaining representative.[5] App. at 2299-2304. The six Locals involved in the instant litigation authorized and directed that their Local assets continue to be held in trust for the benefit of the workers. Pursuant to the internal disaffiliations which followed, all of the rank and file members of the Locals purported to resign their membership in the Boilermakers. In accordance with their resignations and disaffiliations, each of the Locals ceased sending per capita tax payments to the Boilermakers.[6] The Boilermakers claimed that the NLRB elections effectively reduced the membership of the six Locals to zero. On this basis, the Boilermakers' President then notified the officers of the Locals that they were disbanded in accordance with the provisions of Article V, section 6 of the International Constitution.[7] Although they were requested to turn over all of the books, records, properties, funds and assets of the Local Lodge to the International Union, each Local refused to do so and this litigation ensued.
 
 
 7
 Two contracts form the basis of the present dispute--the Merger Agreement and the Boilermakers' constitution. Both the Boilermakers and the Locals claim ownership of Local Union treasuries based on several provisions of these contracts. The Boilermakers' claim to the treasuries is founded upon Article V, section 6 and Article XXXVI, section 2 of their constitution (the "surrender" clauses) which they claim require the surrender of the treasuries upon the disaffiliation of the Locals. Article V, section 6 of the Boilermakers' Constitution provides in pertinent part:
 
 
 8
 Any local lodge having less than ten (10) active members shall be automatically disbanded and its Charter returned to the International Brotherhood, together with all books, records, properties, funds and assets (including trusts, trust funds or other trust properties held, operated or controlled by such Local Lodge) owned or held by such Local Lodge at the time of such disbanding, which shall become the property of the International Brotherhood.
 
 
 9
 App. at 1775-76. Article XXXVI, section 2 of that constitution provides:
 
 
 10
 Section 2. The funds and property of a subordinate body are trust funds for the benefit of its members and shall not be divided in any manner among the members of the subordinate body. Upon the surrender, forfeiture or revocation of its charter other than through consolidation, all funds belonging to such subordinate body shall be forwarded promptly to the International Secretary-Treasurer and all real estate and other property owned or held by such body shall be immediately transferred and conveyed by the proper legal instrument to the International Board of Trustees of the International Brotherhood.... All such funds shall revert to the General Fund of the International Brotherhood with proper record of the transfer maintained by the International Secretary-Treasurer. In the event such subordinate body should ever be rechartered at that location, the Executive Council is authorized to give approval to the transfer of an amount not to exceed fifty percent (50%) of such funds from the General Fund to the credit of the rechartered subordinate body.
 
 
 11
 App. at 1903-04.
 
 
 12
 The Locals' claim to the treasuries is based on several provisions of the Merger Agreement including the preamble, the "retain clause," and the "transfer clause." The preamble of the Merger Agreement provides that:
 
 
 13
 The Constitution of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers will be the supreme law of the merged organization. All provisions of this Agreement are binding and those provisions which conflict with the above referred to Constitution will expire at 12:01 a.m. on the convening date of the Twenty-Eighth Consolidated Convention [1991].
 
 
 14
 App. at 2580. The preamble was intended to apply in cases in which the Merger Agreement conflicted with the constitution. The "retain clause" of the Merger Agreement provides that "Local Union charters held by the current local unions in the United Cement, Lime, Gypsum and Allied Workers International Union will have issued in their stead Boilermaker Charters carrying the present local numbers preceded by a capital D. Each Local Lodge will retain its Local Union treasury." App. at 2581. The Merger Agreement was organized to "track"--or refer to--the provisions of the Boilermakers' constitution. However, the Merger Agreement's retain clause makes no mention of Article V, section 6 or Article XXXVI of the constitution--the provisions requiring reversion of the Locals' assets to the Boilermakers upon disbandment. The Merger Agreement's "transfer clause" provides that:
 
 
 15
 On the effective date of the merger all property; real, personal, and mixed; and all rights, titles, and interest; either legal or equitable; and any monies, funds or properties; tangible or intangible, of the United Cement, Lime, Gypsum and Allied Workers International Union and affiliated District Councils shall, by virtue of the merger, be transferred to and vested in the merged organization in accordance with the Constitution.
 
 
 16
 App. at 2587.
 
 
 17
 The Merger Agreement also contains a provision regarding separation that would permit the cement workers to leave the Boilermakers should a majority of the merged organization decide that the merger was not working out as expected. Counsel for the Boilermakers asserted at oral argument that the difference between the constitution and the Merger Agreement regarding separation was the primary justification of the "conflict" provision in the preamble.[8] The Locals contend, however, that the primary justification for the provision is an alleged conflict among the provisions regarding retention of the treasuries.
 
 
 18
 The district court heard extrinsic evidence pertaining to the intent of the parties and received oral argument from counsel concerning the proper interpretation of the provisions of the Merger Agreement. The court held that, based on the language of the agreements which the court found conflicting, the Locals were legally entitled to keep their treasuries pursuant to the preamble in the Merger Agreement. The district court entered judgment in favor of the Boilermakers for per capita tax payments which the Locals had ceased making to the Boilermakers. The Boilermakers now appeal that portion of the decision denying possession by the Boilermakers of the Locals' treasuries. The individuals and the IWNA appeal from the portion of the decision granting judgment in favor of the Boilermakers with respect to per capita tax payments. We have jurisdiction over the appeal under 28 U.S.C. Sec. 1291 (1982).
 
 II.
 
 19
 A. Right to the Treasuries.
 
 
 20
 The Boilermakers argue on appeal that after the merger, the Boilermakers' constitution became the supreme governing document. Under the Boilermakers' constitution, a Local Lodge with less than ten members is automatically disbanded and its assets revert to the Boilermakers. When the Local Lodges voted to decertify the Boilermakers, they then had no members at all, and thus, the Boilermakers contend that the surrender clauses became operative. They further contend that the surrender clause, which states that the Local Lodges must surrender "properties, funds and assets," compels the Locals to surrender their treasuries. The Boilermakers reach this conclusion based on their contention that the term "assets" in the surrender clause encompasses the treasuries of the Local Lodges. Additionally, they point out that the retain clause of the Merger Agreement was merely an administrative device to prevent the Locals' treasuries from being transferred into the Boilermakers' general fund after the merger.
 
 
 21
 The Locals argue that the retain clause of the Merger Agreement permits them to keep their treasuries even after decertification. They reason that the only way to give proper meaning to the various "retain" and "surrender" provisions of the documents is to conclude that the Locals must "not be subjected until 1991 to a loss of their treasuries as would otherwise be required under the Boilermakers' Constitution." Appellees' Brief at 27. The Locals' contention is based on their theory that the clauses (the retain and transfer and surrender clauses) conflict. They point to the fact that the Locals were included in earlier drafts of the above-cited transfer clause but were not included in the final draft of the clause. App. at 24801. They argue that the conspicuous exclusion of the Locals from the transfer clause mandates the conclusion that it was intended that the Local not be subjected until 1991--pursuant to the conflict provision in the preamble--to a loss of their treasuries as would otherwise be required under the Boilermakers' constitution.
 
 
 22
 As a preliminary matter, we must ascertain whether this case calls for construction, rather than interpretation, of the contracts. Courts must determine "as a matter of law which category written contract terms fall into--clear or ambiguous." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980) (citations omitted). This Court has stated that "[w]hen the issue is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law." Ram Constr. Co., Inc. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984). In this case, the district judge construed--as opposed to interpreted--the Merger Agreement. See App. at 599 (stating that "I will enter judgment for the defendants because the Merger Agreement is unambiguous in a legal sense and the extrinsic evidence of any contrary intent from the plain meaning of the words is factually insufficient to establish such a contrary intent."). We agree that we must construe the Merger Agreement and thus we have plenary review. Accord International Bhd. of Boilermakers v. Local Lodge D111, 858 F.2d 1559, 1561-62 (11th Cir.1988) (finding that, "[i]n reviewing the district court's findings that the contract is unambiguous, we examine the disputed contractual terms in the context of the entire agreement [and] ... [g]iven the plain language of these agreements, we find the district court's conclusions reasonable").[9] Although we agree that the documents should be construed, we hold that the district judge in this case erred in his construction.
 
 
 23
 Unlike the district judge, we read the Merger Agreement and the Boilermakers' constitution to be reconcilable. Nearly every court which has construed this identical language has reached the same conclusion. See, e.g., International Bhd. of Boilermakers v. Local Lodge D111, 681 F.Supp. 1570 (S.D.Ga.1987), aff'd, 858 F.2d 1559 (11th Cir.1988); International Bhd. of Boilermakers v. Local Lodge D238, 678 F.Supp. 1575 (M.D.Ga.1988); International Bhd. of Boilermakers v. Local Lodge D405, 699 F.Supp. 749 (D.C.Ariz.1988). See also International Bhd. of Boilermakers v. Local Lodge D474, 673 F.Supp. 199, 205 (W.D.Tex.1987) (holding that the Boilermakers trusteeship upon the local was valid and ordering the defendant local to relinquish to the trustee all assets of the local). We agree with these courts that the correct construction of the retain clause in the Merger Agreement is that as long as a Local continues to exist, the Local may retain the treasury of the former Cement Worker Local Union. However, if the Lodge ceases to exist as a Boilermaker entity, the surrender clauses of the Boilermaker constitution apply. The Merger Agreement, therefore, has no provision for the retention of Local treasuries after the Lodge has disbanded.
 
 
 24
 The district court read the word "treasuries"--a word not found in Article V or Article XXXVI of the constitution--to entitle the Locals to retain their monies notwithstanding disaffiliation. We find, however, that the district court erred in its construction--not only of the word "treasuries", but of the contracts as a whole. First, the retain clause of the Merger Agreement was indexed under Article V, section 3--the constitutional provision setting forth the jurisdiction of the Local Lodges. It neither refers to nor modifies Article V, section 6 or Article XXXVI of the constitution, which call for the surrender of Local Lodge assets upon disbandment. Second, the retain clause states that "[e]ach Local Lodge will retain its Local Union treasury." App. at 2581 (emphasis added). A "Local Lodge" is a Boilermaker entity. The implication is that only Boilermaker entities are entitled to retain their treasuries. The Merger Agreement does not provide that members of the Local Lodge may retain the treasuries after a disbandment. The Agreement provides only that the Local Lodge shall retain the treasury. When the Local Lodge ceases to exist and its charter is revoked, the retain clause no longer applies. Third, the trial court found the word "treasuries" unambiguous, and ruled as a matter of law that the word "is never equated with 'all assets.' " App. at 597. The district court stated that construing "treasury" to mean "all assets" "is crucial to plaintiffs' position because it enables plaintiffs to harmonize the retain clause with the provision set forth in 6(c) above [the Merger Agreement's transfer clause]." App. at 592. However, we believe that the word "assets" found in the surrender clause is the touchstone of this analysis. We construe the word "assets", found in the surrender clause of the Boilermaker constitution, to encompass the treasuries of the Locals. This construction makes the surrender and retain clauses reconcilable as the Local treasuries come within the ambit of the surrender clause.
 
 
 25
 Since the district court's ruling but prior to the oral argument, the Eleventh Circuit Court of Appeals, in Local Lodge D111, rendered its opinion construing the identical Merger Agreement and the Boilermakers' constitution. Unlike the district court in the present case, the Court of Appeals for the Eleventh Circuit in Local D111 found that "Local D111's contention that the retain clause conflicts with the forfeiture clauses is without merit", 858 F.2d at 1562, and that "the plain language of these provisions shows that they are consistent." Id. The court reasoned that "[w]hile the merger agreement permitted the locals to maintain control over their assets and treasury while affiliated with International after the merger, once the local no longer existed, it lost this control. This reading of the two clauses is clear and unambiguous." Id. We agree. We similarly construe the contracts to require that, once the Locals end their affiliation with the International, they can no longer exercise control over the assets pursuant to the Merger Agreement. The Merger Agreement does not extinguish the Boilermakers' right to the surrender of the Local Lodge treasuries upon disbandment. We do not read the retain clause to conflict with the surrender clause in Article V, section 6 of the constitution. The language of both clauses can be read together and both can be given effect.
 
 
 26
 B. Liability for Per Capita Taxes.
 
 
 27
 The district court ruled that the Locals were obligated to pay per capita taxes until the date of NLRB certification of the Locals as affiliates of the IWNA. App. at 600.[10] We agree and, therefore, we will affirm this portion of the district court's ruling. Accord Local Lodge D111, 858 F.2d at 1564. The Boilermakers, even after the Locals' internal disaffiliation votes, remained the bargaining agent for the Locals until the National Labor Relations Board decertification. See Local Lodge D405, at 755 (stating that "[u]ntil the appropriate procedures were completed to remove the International as the bargaining representative, the existing certification must be honored") (citation omitted). Moreover, the Boilermakers provided support services to the Local Lodges until decertification. We hold that the per capita tax is due from the Local Lodges for each member until the date of decertification provided the member remained employed and remained a member of the Local Lodge regardless of whether the Lodge considered itself disaffiliated and regardless of a particular member's belief that he was or was not a Boilermaker. See, e.g., International Bhd. of Boilermakers v. Local Lodge D31, 694 F.Supp. 1203 (D.Md.1988).[11]
 
 
 28
 C. Preemption of State Law Claims.
 
 
 29
 The Locals argue on their cross appeal that the district court erred in failing to find that the Boilermakers' state claims for tortious interference are preempted under 29 U.S.C. Sec. 185. Appellee's Brief at 39. They contend that the district court did not predicate its findings of tortious interference upon federal common law. However, the Boilermakers did allege in their complaint the following:
 
 
 30
 37. By its receipt and continued control over assets of the International Union, the IWNA is tortiously interfering with the contractual relations of the International Union and its Local Lodges in violation of Section 301 of the Labor Management Relations Act.
 
 
 31
 App. at 459. We affirm the order of the district court based on Section 301.[12] We find the claim of tortious interference to be properly pursued under Section 301. See Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 381 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982) (holding that "a claim of tortious interference with a labor contract is one arising under federal common law over which the district court has jurisdiction.").III.
 
 
 32
 In conclusion, we find that the district court erred in holding that the Locals are entitled to retain their treasuries and we will reverse this part of its judgment. We affirm the district court's determination that the Locals are liable for per capita taxes until the date on which the NLRB certifies the IWNA as the legal representative of the Locals. Finally, we affirm the district court judgment as to the claim of tortious interference under section 301. Each party to bear its own costs.
 
 
 
 [1]
 There are numerous other plaintiffs in this action. For convenience we will refer to the plaintiffs collectively as the "Boilermakers."
 
 
 [2]
 In the nomenclature used by the parties, Boilermaker Locals are designated as Local Lodges and Cement Union Locals are designated as Local Unions
 
 
 [3]
 At that time, the Cement Union was governed by its own International Constitution
 
 
 [4]
 It was the Cement Union's desire to be able to select its own International Vice President until the Twenty-Eighth Consolidated Convention--a date which coincides with the expiration of the Merger Agreement itself
 
 
 [5]
 In each case, an election was conducted by the NLRB and the IWNA was certified as the new bargaining representative, thereby ousting the Boilermakers at those locations
 
 
 [6]
 The parties stipulated that the amount of per capita tax withheld until the time of the NLRB elections totalled $39,000.00
 
 
 [7]
 Several other Locals have disbanded. In each case, Northrip sent a standard "disbanding" letter requesting the assets of the Local to be sent to the Boilermakers pursuant to Article V, section 6, app. at 1775, which required surrender of the Locals' assets. See Appellant's Brief at 14-15
 
 
 [8]
 The constitution prohibits disaffiliation. Article XXIX, section 2(a) provides that a member may not "evade or avoid his responsibility to the Organization as an institution, or engage in or advocate any conduct that would interfere in the Organization's performance of its legal or contractual obligations or functions." App. at 1820-21. Article XVII, section 1(i) makes encouraging or engaging in a secessionist movement a chargeable offense. App. at 1793-94
 
 
 [9]
 The Court of Appeals for the Eleventh Circuit in Local Lodge D111--a case construing the identical language--agreed with the district court's conclusion in that case that "International was entitled to judgment as a matter of law since the only issues presented concerned unambiguous contractual language and involved no genuine questions of material fact." 858 F.2d at 1561
 
 
 [10]
 Members of each Boilermakers Local Lodge owe to the Local Lodge monthly dues. App. at 1822. Each Local Lodge owes the Boilermakers a per capita tax based on dues receipts of the Local Lodges. App. at 1786-87. Each member of the Locals was asked to sign a Dues Revocation and Dues Authorization Card, purporting to revoke prior dues authorizations and requesting that dues be sent by employers to a new local of the IWNA. App. at 2615. It was only after these cards were signed that petitions were filed with the NLRB, seeking certification of the IWNA as the bargaining agent representative of these employees. See Appellant's Reply Brief at 35
 
 
 [11]
 There the court stated that:
 There can be no doubt that the will of Local 31 is to become disaffiliated from the IBB and to become affiliated with the IWNA. And on the other side the IBB would like to prevent disaffiliation. These issues are for the NLRB to decide pursuant to a Board certified election. That election may be in the offing in accordance with established procedures, but it has not yet taken place. The informal votes of members, as occurred here, will not effect a disaffiliation and cause an affiliation with another union.
 
 
 [694]
 F.Supp. at 1206-07
 
 
 [12]
 Section 301 provides: "Suits for violation of contracts between an employer and a labor organization representing employees ... or between any such labor organizations, may be brought in any district court of the United States...." 29 U.S.C. Sec. 185(a) (1982)