776 F.2d 66
 120 L.R.R.M. (BNA) 3041, 103 Lab.Cas. P 11,688
 GRIESMANN, Donald H.; Henderson, Richard H.; Harrison,
Jesse L.; Barndt, Leslie R.; Fuls, Norman W.; Quinton,
Charles D.; Lippincott, John L. Sr.; Harhart, David J.;
Nelson, Robert S.; Gurinko, Michael G.; Manieri, Ernest
J.; McKelbey, Gerald J.; Kutzler, Barry R.; Widemann,
Waldemar W.; Kutzler, Roger W.; Leh, Richard W.; Quigley,
John M.; Heiserman, Melvin G.; Boger, Durrell M.;
Lippincott, John J. Jr.
v.
CHEMICAL LEAMAN TANK LINES, INC., Nazareth Terminal,
Teamsters Local 773.
Appeal of Donald H. GRIESMANN, et al., in No. 84-1747.
Appeal of CHEMICAL LEAMAN TANK LINES, INC., in No. 84-1748.
 Nos. 84-1747, 84-1748.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 9, 1985.
Decided Oct. 29, 1985.
 
 Alice W. Ballard (argued), Jean R. Sternlight, Samuel & Ballard, P.C., Philadelphia, Pa., for Donald H. Griesmann, et al.
 Robert J. Bray (argued), Louis A. Minella, Thomas M. Tammany, Robert J. Bray & Associates, Philadelphia, Pa., for Chemical Leaman Tank Lines, Inc.
 Stephen C. Richman (argued), Markowitz & Richman, Philadelphia, Pa., for Local 773, etc.
 Before HUNTER, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 This case arises from a suit brought under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185(a) (1982). Essentially, this appeal requires us to determine three things: whether the district court correctly characterized an agreement between Chemical Leaman Tank Lines, Inc. ("Chemical Leaman") and Local 773 of the International Brotherhood of Teamsters ("the Union") as a collective bargaining agreement; if not, whether disputes as to the meaning and application of the agreement were encompassed within the arbitration provisions of the Union's collective bargaining agreements with Chemical Leaman; and if so, whether the grievance committee's decision concerning the application of the agreement should be set aside in a Sec. 301 action against Chemical Leaman and the Union. Appellate jurisdiction is based upon 28 U.S.C. Sec. 1292(b) (1982). For the reasons stated below, we will vacate and remand.
 
 I.
 
 2
 Chemical Leaman is a trucking concern that hauls liquid and dry products as a common and contract carrier. Prior to December 31, 1975, Chemical Leaman operated a liquid and two cement products terminals in Northeastern Pennsylvania. Chemical Leaman's two cement terminals were located in Stockertown and Nazareth; its liquid terminal was located across the street from the Nazareth cement terminal. Although Teamsters Local 773 represents all of the cement and liquid drivers in collective bargaining, they are organized into two bargaining units. During the relevant period, the cement drivers at Stockertown and Nazareth were covered by a succession of multi-employer, multi-union collective bargaining agreements, known as the "Eastern Area Cement Haul Agreement" or "Cement CBA." A separate succession of multi-employer, multi-union agreements, known as the "Eastern Area Tank Haul Agreement," or "Liquid CBA," covered the Nazareth liquid drivers. The collective bargaining agreements covering the two bargaining units are nearly identical.
 
 
 3
 As a result of the dwindling cement hauling market, Chemical Leaman closed its Nazareth cement terminal on December 31, 1975, and moved the cement drivers to the Nazareth liquid terminal. Because the drivers belonged to different bargaining units, the cement and liquid drivers retained their separate identity and assigned work at the terminal according to separate seniority lists.[1] Chemical Leaman desired the eventual combination of the two seniority lists to reduce both the administrative burden and the threat of strikes presented by the two list system.
 
 
 4
 Although its cement work continued to decline, by early 1977 Chemical Leaman's liquid hauling business increased to the point where it required additional liquid drivers at Nazareth. Believing this increase presented the opportunity to consolidate the two seniority lists, Chemical Leaman representative Raymond Snyder met with one of the Union's business agents, Edward Tonkay, to draft a proposal allowing the Nazareth cement drivers to transfer to the bottom of the liquid seniority list before the company hired additional liquid drivers. An April 27, 1977 letter from Mr. Snyder to Mr. Tonkay outlines the proposal, and provides, in relevant part:
 
 
 5
 1. As agreed, we will post a bid allowing cement drivers to move on a permanent transfer to the bottom of the Nazareth Liquid seniority list.
 
 
 6
 2. Their position on the liquid list shall be in keeping with their company seniority, however, Tank seniority shall prevail for all purposes and no "dovetailing" shall take place.
 
 
 7
 3. Daily dispatch shall be by Tank seniority and men bidding from cement to liquid shall be dispatched from the bottom of the liquid list.
 
 
 8
 There will be no claim to cement work beyond what is commonly recognized as "on-call" status. Men remaining on the cement list will be dispatched, as in the past, in keeping with the cement contract.
 
 
 9
 Mr. Snyder then dictated a notice addressed to the Nazareth cement drivers that was subsequently posted in the Nazareth terminal on May 20, 1977. The May 20 notice stated:
 
 
 10
 As agreed between Local Union # 773 and Chemical Leaman Tank Lines, Inc., the Company is posting this notice before hiring additional liquid drivers to allow present cement drivers the opportunity to transfer on a permanent basis to the bottom of the liquid list. The terms of this transfer will be governed by the Company's letter of April 27, 1977. In the future, no additional men will be added to the cement list. Anybody interested in this permanent transfer shall contact Bob Ranck or Don Sawyer before 8 AM, May 31.
 
 
 11
 This notice shall come down at 8 AM, May 31, 1977.
 
 
 12
 Snyder sent copies of the April 27 letter and May 20 notice to the Union and the shop stewards. A number of less senior cement drivers accepted the cement--liquid transfer opportunity. Chemical Leaman subsequently hired new tank drivers, adding them to the liquid list under the transferred drivers. At the time, Chemical Leaman hoped to achieve its goal of a single list system through the attrition of the remaining Nazareth cement drivers.
 
 
 13
 In July 1982, however, Chemical Leaman closed its Stockertown cement terminal and transferred the Stockertown drivers and cement work to the Nazareth terminal, precipitating the instant dispute. Pursuant to Article 5[2] of the Cement CBA then in effect, the Stockertown cement drivers were "dovetailed"[3] into the Nazareth cement seniority list. According to the Griesmann plaintiffs, who are all liquid list drivers, the dovetailing of the Stockertown drivers violated the company's promise in the May 20, 1977 notice that "no additional men will be added to the cement list," and harmed plaintiffs by ensuring that there would be little, if any, cement overflow work for the liquid haulers.[4]
 
 
 14
 On August 25, 1982, eight of the original eighteen plaintiffs[5] in this action filed grievances with the Joint Committee, a grievance panel composed of equal numbers of union and management members provided for in Article 7 of the Cement and Liquid CBAs.[6] Both the April 27, 1977 letter from Snyder to Tonkay and the May 20, 1977 notice were submitted to the Joint Committee for consideration in the grievance procedure. Neither the Union nor Chemical Leaman argued that the documents evidenced a contract "not to add" drivers to the cement seniority list, however. On January 25, 1983, the committee denied the grievance petitions.
 
 
 15
 Plaintiff-appellees filed this suit, alleging that Chemical Leaman breached its CBA with the Union and that the Union breached its duty of fair representation by failing to advocate plaintiffs' contractual rights under the May 20, 1977 notice. The parties agreed to bifurcate the trial into liability and damages phases to permit an interlocutory appeal after the liability phase; trial on the liability issue commenced in late January, 1984. Prior to jury trial, the district court granted plaintiffs' motion for partial summary judgment, concluding that the 1977 notice reflected a contract characterized by the court as a collective bargaining agreement ("the 1977 Agreement") between Chemical Leaman and Local 773. The court determined that the 1977 Agreement obliged Chemical Leaman to refrain from any future additions to the cement seniority list, and that Chemical Leaman breached the 1977 Agreement as a matter of law when it dovetailed the Stockertown drivers. The judge refused to instruct the jury about the plaintiffs' rights under the 1977 Agreement, but permitted plaintiffs to argue that the May 20, 1977 notice constituted a contract. The jury found that the Union did not breach its duty of fair representation, and the district court entered a judgment order on June 20, 1984, finding Chemical Leaman liable for breach of the 1977 Agreement. Upon application by the parties, the district court allowed an interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982).[7] We granted this appeal on December 12, 1984.II.
 
 
 16
 The district court found that the May 20, 1977 notice reflected a contract also evidenced by the April 27 letter and that that contract was a collective bargaining agreement. In so finding, the court reasoned that "[w]here the union has taken 'a leading role in representing the employee[s] and in negotiating the ... agreement,' it is likely that a collective bargaining agreement exists" quoting Davis v. Ohio Barge Line, Inc., 697 F.2d 549, 553 (3d Cir.1983). The lower court's reliance upon Davis is misplaced, however, because the cited language concerns only whether a labor contract within the meaning of Sec. 301 of the Labor Management Relations Act exists. Davis does not purport to distinguish between a labor contract and a collective bargaining agreement, but instead distinguishes labor contracts, i.e., contracts between an employer and a union, from contracts between employers and employees outside the ambit of Sec. 301.
 
 
 17
 A collective bargaining agreement is the paradigmatic labor contract, covering a wide array of contingencies that may arise in the employment relationship, and distinguished by provisions for the arbitration of disputes concerning the agreement's meaning and application. In United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1437, 4 L.Ed.2d 1409 (1960), Justice Douglas, speaking for the Court, described the collective bargaining agreement:
 
 
 18
 The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law--the common law of a particular industry or plant.... A collective bargaining agreement is an effort to erect a system of industrial self-government.... [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of self government. Arbitration is the means of solving the unforseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.
 
 
 19
 363 U.S. at 578-81, 80 S.Ct. at 1351-52. Thus defined, a collective bargaining agreement differs "in nature, scope, and purpose from the ordinary commercial contract." Syufy Enterprises v. Northern California State Association of IATSE Locals, 631 F.2d 124 (9th Cir.1980) (per curiam), cert. denied, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981). The April letter and May notice reflect, at most, a contract between Local 773 and Chemical Leaman. Although the district court erred in characterizing the 1977 Agreement as a collective bargaining agreement, we cannot say that it erred in finding the 1977 Agreement to be an enforceable labor contract.
 
 
 20
 Chemical Leaman argues that the 1977 Agreement is simply an informational notice, unilaterally drafted and posted by the company, and suggests that this case is similar to Local 1330, United States Steel Workers v. United States Steel Corp., 631 F.2d 1264 (6th Cir.1980), where the court refused to enforce the employer's oral promises because the promises lacked some of the minimum features of a formal legal contract required by the steel workers' collective bargaining agreement. Id. at 1269. Although Mr. Snyder dictated and posted the notice, the April 27, 1977 letter outlining the terms of the cement-liquid transfer opportunity indicates that the Union and Chemical Leaman agreed to the posting of a notice and fairly suggests that the terms of the notice, like the terms of the letter, were the subject of negotiations between the Union and Chemical Leaman. Appellant's contention that the notice could not be a legal contract under the Cement CBA also fails; we have been shown no provision of the 1977--1980 Cement CBA that invalidates the contract.[8]
 
 
 21
 Chemical Leaman argues that the trial court erred by refusing to consider parol evidence that the parties intended the 1977 Agreement only to prevent the company from hiring new cement drivers and not to proscribe additions by dovetailing. Under the rule of Mellon Bank, N.A. v. Aetna Business Credit, 619 F.2d 1001 (3d Cir.1980), trial courts are bound to interpret contractual terms to give effect to the parties' "objective manifestations of their intent" rather than attempt to ascertain their subjective intent. Id. at 1009. Only if the terms used are ambigious, id. at 1011, or if the contract is not fully integrated, id. at 1010 n. 9, should the trial judge allow the finder of fact to consider evidence that might vary or add to the contract's express terms.[9] Id. at 1011.
 
 
 22
 We believe that the Union and Chemical Leaman must be permitted to introduce extrinsic evidence to support their contention that the contract only bars adding new hires to the cement list. The court's construction of the 1977 Agreement involved a lengthy inquiry into the circumstances surrounding the April 27 letter and May 20 notice, suggesting that contract is not integrated. Indeed, if not for the court's reliance upon the parties' testimony concerning the Union's and Chemical Leaman's negotiations and the state of the trucking industry in northeastern Pennsylvania, the court would not have found a contract at all. Thus, even were we to conclude that the 1977 Agreement's terms are unambigious, we would find that the trial court erred in refusing to admit the parties' proffer of extrinsic evidence. We find, however, that the parties advanced "a reasonable alternative interpretation," Mellon Bank, 619 F.2d at 1011 (emphasis in the original), of the term "add," and therefore that the trial judge erred by refusing to admit parol evidence that might prove a different meaning for "add" than the one ascribed by the court. Because the April 17 letter and the May 20 notice do not integrate all the contractual terms, and because in the particular context in which it is used, the term "add" is ambigious, we believe that the jury, as the finder of fact, should have considered extrinsic evidence regarding the parties' alleged specialized use of the term "add" and that the jury should determine whether Chemical Leaman breached its obligation not to "add" drivers to the cement list. Accordingly, we vacate the district court's finding that Chemical Leaman breached the 1977 Agreement.
 
 III.
 
 23
 It is well recognized that individual employees can bring suit against their employers in federal court for breach of a contract between an employer and a union. Davis, 697 F.2d at 552. Federal labor policy requires employees to exhaust any grievance procedure provided in the union's collective bargaining agreement when that agreement governs the manner in which the employee's rights may be enforced. Vaca v. Sipes, 386 U.S. 171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967); see Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). Because judicial review of arbitration proceedings is limited,[10] see The Steelworkers Trilogy: United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrior & Gulph Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Co., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960), the employee usually will be bound to the result by the agreement's language making the arbitration award "final and binding" upon the employee. W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Thus, to bring a successful suit, the employee must challenge the validity of the grievance procedure as well as allege a breach of the collective bargaining agreement by the employer. A successful Sec. 301 suit usually entails two independent but intertwined causes of action: one against the employer for breach of the collective bargaining agreement, the other against the union for breach of the duty of fair representation. See DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 163-64, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); Vaca, 386 U.S. at 185, 87 S.Ct. at 914.
 
 
 24
 The district court found the Joint Committee decision invalid because the court believed the committee lacked jurisdiction over the dispute. According to the court, the 1977 Agreement is a collective bargaining agreement, albeit one without a grievance procedure vesting jurisdiction in the Joint Committee or a finality clause precluding review of the Joint Committee's decisions. Our conclusion that the 1977 Agreement reflects a contract dealing with the seniority rights of drivers under the Cement and Tank CBAs indicates that the dispute should be settled according to the resolution procedures detailed in those agreements. Indeed, we believe that these agreements vest the Joint Committee with mandatory jurisdiction over the dispute.[11] Section 5.7 of the Cement CBA, governing seniority in the event of terminal closings, provides that displaced employees "shall be dovetailed in accordance with the procedures outlined in Article 5, Section 5.5." Section 5.5 provides that "[a]ny controversy with respect to [the seniority of affected employees] shall be submitted to the Joint Grievance Procedure in Article 7." Section 7.2 then locks in the Joint Committee's jurisdiction over this dispute: "[a]ll grievances, or disputes involving any controversy, complaint, dispute or misunderstanding arising as to the meaning, application or observance of any provisions of this Agreement" shall be subject to the collective bargaining agreement's grievance procedures. It is clear that the Joint Committee had jurisdiction over the dispute, as the dispute involves the application of the CBA's dovetailing provisions in light of the 1977 Agreement.[12]
 
 
 25
 Thus, the district court must defer to the Joint Committee's decision unless (i) the committee's decision "fails to draw its essence from the collective bargaining agreement;" or (ii) the decision is tainted by fraud or misconduct; or (iii) the Union breached its duty of fair representation of the plaintiffs before the Joint Committee. See Enterprise Wheel, 363 U.S. at 597, 80 S.Ct. at 1361; Bieski v. Eastern Automotive Forwarding Co., 396 F.2d 32, 38 (3d Cir.1968).[13]
 
 IV.
 
 26
 Plaintiffs raise no contention that the Joint Committee decision exceeded the authority granted by the Cement and Tank CBAs, nor do they allege fraud or misconduct in the proceedings.[14] The jury found that the union did not breach its duty of fair representation. Ordinarily, we would defer to the jury's finding. Indeed, on the record, this case appears substantially similar to Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) where the Supreme Court held that the union, representing two groups of employees in a seniority dispute resulting from the merger of two transport lines, did not breach its duty simply because it advocated dovetailing the employees instead of favoring one group by arguing that the transferred employees had no right to employment. "Conflict between employees represented by the same union is a recurring fact," the Court noted, adding that it was unwilling to weaken the collective bargaining and grievance process by preventing the union from taking a position in the seniority dispute "in good faith and without hostility or arbitrary discrimination." Humphrey, 375 U.S. at 349-50, 84 S.Ct. at 371-72.
 
 
 27
 Plaintiffs maintain that the trial court abused its discretion, however, in refusing to instruct the jury that the 1977 Agreement was a binding contract.[15] In refusing to give the proffered instruction, the trial court correctly observed that the two causes of action in a successful Sec. 301 suit are conceptually distinct. Yet we are mindful also that these claims are "inextricably interdependent." DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983) (quoting United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 66, 101 S.Ct. 1559, 1565, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring in judgment)). That a judge or a jury later finds that the company breached a labor contract does not constitute a per se breach of the duty of fair representation simply because the union failed to grieve, see Vaca, 386 U.S. at 192-93, 87 S.Ct. at 917-18, or failed to be sufficiently prescient to allege before the Joint Committee that the Stockertown dovetail constituted a breach of contract. In either case, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).
 
 
 28
 Nevertheless, the existence of contractual rights and the duty of fair representation are intertwined; the Union's failure to suggest plaintiffs had contractual rights under the 1977 Agreement, in the face of the court's finding that 1977 Agreement gave the employees enforceable contractual rights, is evidence that generally should be considered by the finder of fact in a duty of fair representation case.[16] By directing the district court to submit to the jury the interpretation and breach issues, the jury must decide, in light of that evidence, and all other evidence, including evidence of the grievance proceedings before the Joint Committee, whether the Union breached its duty of fair representation. By vacating the trial court's rulings construing the 1977 Agreement and finding Chemical Leaman's breach of that contract, we leave it to the jury to determine the true meaning of the agreement and whether either party breached its duty with respect to it.
 
 V.
 
 29
 Our discussion contemplates that the meaning of the 1977 Agreement, Chemical Leaman's breach of the 1977 Agreement, and the Union's breach of its duty of fair representation will be decided by the jury on remand. In light of our holding that the Joint Committee properly exercised jurisdiction over the dispute, the court should instruct the jury that the Union may be held liable if its representation of the Griesmann plaintiffs "has been dishonest, in bad faith, or discriminatory." Hines v. Anchor Motor Freight, 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976), i.e., conduct that "seriously undermines the integrity of the arbitral process." Id. at 567, 96 S.Ct. at 1058. Finally, our finding of Joint Committee jurisdiction compels the district court to reinstate its order dismissing those plaintiffs who failed to avail themselves of the grievance procedures.[17]
 
 
 30
 The district court's order will be vacated and the case will be remanded for disposition in accordance with this opinion.
 
 
 
 [1]
 Cement and liquid drivers are dispatched on work according to their position on their respective seniority lists. "Overflow" work, or work available after all drivers on the relevant seniority list have been dispatched, is assigned to drivers on the other list who have not been dispatched. Overflow work generally accrues to the benefit of less senior drivers
 
 
 [2]
 Article 5 of the 1980--1983 Cement CBA, covering seniority, provides for the absorption of drivers from closed plants by dovetailing in the same manner as mergers or acquisitions of terminals. See infra part III
 
 
 [3]
 "Dovetailing" refers to the combination of two separate seniority lists into one upon the transfer of employees from one terminal to another
 
 
 [4]
 When Chemical Leaman announced its plans to the Nazareth drivers, it offered to reinstate those drivers who transferred to the liquid list to the current cement list with their original cement seniority prior to the dovetailing. Only one driver accepted this offer
 
 
 [5]
 Although the trial court originally directed a verdict against the ten plaintiffs who failed to file grievances with the Joint Committee, it later re-instated the plaintiffs after finding that the Joint Committee lacked jurisdiction over the dispute
 
 
 [6]
 Section 7.3 of the 1980-83 Cement and Tank CBAs provide, in part:
 Any panel of the Joint Committee hearing a case shall consist of a minimum of three (3) representatives of the Employers and three (3) representatives of the Union, but at all times shall consist of an equal number of designated representatives of the Employers and the Union.
 It shall be the function of the Joint Committee or a panel thereof to settle disputes in accordance with Section 7.2 of this Article.... A decision by a majority of any panel of the Joint Committee shall be final and binding on the parties and employees involved.
 
 
 [7]
 The district court order listed the following as controlling questions of law for certification:
 
 
 [1]
 Whether an employer who has breached a collective bargaining agreement containing no grievance procedure and no dispute resolution mechanism, can defend an action brought under Section 301 of the Labor Management Relations Act, on either of the following grounds:
 (a) that there is no breach of the duty of fair representation by the union; or,
 (b) that a Joint Committee with no jurisdiction over the collective bargaining agreement ruled in the employer's favor on grievances filed by the union over the breach.
 
 
 [2]
 In an employees' duty of fair representation case against their union, where their theory is that the union arbitrarily subordinated their rights under one contract to the rights of other employees under a different conflicting contract, whether the Court erred when it kept the jury from the fact that the plaintiffs' claims under the first contract were in fact legitimate and enforceable, and that the company had unlawfully violated their contract rights
 Certification of the questions by the motions panel does not bar our review of the merits. Murphy v. Heppenstall Co., 635 F.2d 233, 235 n. 1 (3d Cir.1980), cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982); IOP Chapter 10.F [Certification Under 28 U.S.C. Sec. 1292(b) ].
 
 
 [8]
 Indeed, the contract may even be a supplement to the Cement CBA: Sec. 5.9 of the Cement CBA explicitly provides for alternative seniority arrangements by permitting the "disposition of questions of seniority" arising from time to time by the Union and Chemical Leaman
 
 
 [9]
 A number of courts, including this one in Mellon Bank, have balanced a liberal parol evidence rule with strict adherence to the plain meaning rule. Goetz & Scott, The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms, 73 Calif.L.Rev. 261, 309 n. 127 (1985). Professors Goetz and Scott observe that the two rules co-exist because they serve separate functions and suggest that contractual interpretation should hold the parties to the "plain meaning" of express terms but allow the parties to supplement implied terms with contextual sources. Id. at 311-20
 
 
 [10]
 Arbitration awards and grievance committee decisions are reviewed under the same standard. Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32, 37 (3d Cir.1968)
 
 
 [11]
 Even if we concluded that the dispute is subject to the CBAs' "permissive jurisdiction" provisions, we would still find Joint Committee jurisdiction over the dispute. In Teamsters Local Union No. 764 v. J.H. Merritt & Co., 770 F.2d 40 (3d Cir.1985), we recently held that when a party submits to arbitration, it is bound to honor the arbitrator's award because submission to the procedures evidences an implicit agreement to arbitrate. Id. at 42. Moreover, the court held that a party waives its right to contest arbitration committee jurisdiction in court when it fails to raise the jurisdictional objection before the committee. Id. at 42. Thus, whether the grievance committee's jurisdiction is characterized as "mandatory" or "permissive" under the Cement and Tank CBAs is irrelevant to the binding effect of the committee's decision
 
 
 [12]
 Plaintiffs' counsel urged at oral argument that the dispute could not be characterized as a seniority matter, as plaintiffs contend that the 1977 Agreement prevents Chemical Leaman from adding drivers in any fashion to the cement list, and does not concern the method in which drivers are added. Therefore, counsel believes that the Cement and Liquid CBAs' seniority provisions do not vest the Joint Committee with mandatory jurisdiction over the dispute, and that Joint Committee jurisdiction could only be permissive
 In Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Supreme Court faced a similar argument. There, employees arguing that the employer could not consolidate employees in two transport lines suggested that the collective bargaining agreement's grant of jurisdiction to the grievance committee over seniority disputes resulting from the absorption of transport lines did not vest the committee with jurisdiction over the initial question whether the employees could be absorbed at all. The Court found that the committee possessed jurisdiction, noting "the power of the [grievance committee] over seniority gave it power over jobs." Humphrey, 375 U.S. at 347, 84 S.Ct. at 370. In the instant case, we are persuaded that section 5.5 gives the Joint Committee jurisdiction over the question whether transferred employees should be added to the Nazareth cement list as well as the method in which they may be added.
 
 
 [13]
 We recognize that there are other limited grounds for overturning an arbitration award, e.g., procedural flaws such as arbitrator misconduct, awards against public policy, and awards that violate a specific command of the law. See Teamsters Local 249 v. Western Pennsylvania Motor Carriers Assoc., 574 F.2d 783, 787 n. 5 (3d Cir.1978); Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123, 1128 n. 27 (3d Cir.1969)
 
 
 [14]
 We cannot accept plaintiffs' contention that the Joint Committee's decision is reviewable because the union represented two groups of employees with conflicting interests. Plaintiffs rely upon Bieski v. Eastern Automotive Forwarding Co., 396 F.2d 32 (3d Cir.1968), a case where the union represented two groups of employees in a seniority dispute resulting from the merger of two trucking lines. While it is true that the Bieski court observed that the union's representation of conflicting interests before the grievance committee was a "complicating factor," Bieski, 396 F.2d at 39, Bieski stands for the proposition that grievance committee jurisdictional decisions are reviewable by the court. Bieski, 396 F.2d at 38
 
 
 [15]
 Griesmann objected to the court's refusal to charge at trial, in conformity with Federal Rule of Civil Procedure 51
 
 
 [16]
 Because the jury will consider the parties' evidence concerning the 1977 Agreement, the Griesmann plaintiffs' contention that the trial court erred in failing to instruct the jury as to the existence and definition of the employees' rights under the 1977 Agreement is no longer relevant and need not be decided here
 
 
 [17]
 The Griesmann plaintiffs also maintain that the trial court abused its discretion in refusing to instruct the jury about the Union's deception of the employees as to the enforceability of the 1977 Agreement, in refusing to amend the plaintiffs' complaint after jury trial to include class action allegations, and in denying plaintiffs' injunctive relief. We find no abuse of discretion