PIEZO CRYSTAL COMPANY, a division of PPA Industries, Inc., Plaintiff

v.

The UDDEHOLM CORPORATION, Uddeholms, A.B., Uddeholm Strip Steel, A.B. and Randall Yates, an individual, Defendants.

Civ. No. 91–0938.

United States District Court, M.D. Pennsylvania, Scranton Division.

Aug. 18, 1994.

R. Stephen Shibla, Rhoads & Sinon, Harrisburg, PA, for plaintiff.

Martha M. Mannix, Rebecca McClincy–Darr, Arnold Friedman and Edward Friedman, Friedman & Friedman, Pittsburgh, PA, for defendants.

## MEMORANDUM

VANASKIE, District Judge.

In its amended complaint, filed on February 10, 1992 (Dkt. Entry # 15), Piezo Crystal Company (hereafter "Piezo") asserted contract and fraud claims in relation to its purchase of steel for use in its production of precision timing devices. Jurisdiction exists based upon diversity of citizenship.

On October 7, 1993, defendants moved for summary judgment on all claims asserted in the amended complaint. For the reasons stated below, the motion will be granted in part and denied in part.

## I. BACKGROUND

Piezo manufactures precision timing devices for use in computers, communications, and testing equipment which have scientific and military applications. Piezo also cuts quartz to detailed specifications for use in their products and by other manufacturers. The quartz, once cut to specification, is called a "crystal wafer." When properly cut, the

crystal wafer resonates at pre-determined frequencies from electronic stimulation.

To cut the quartz, Piezo uses a specialized saw, called a slurry saw, equipped with toothless steel blades. These blades must meet very particular metallurgical and mechanical properties. Piezo cuts the blades from steel supplied by manufacturers such as the defendant corporations (hereafter "Uddeholm").[1] Piezo initiated this action due to production problems it alleges were caused by blades made from Uddeholm steel in thicknesses of ".008," which is eight thousandths of an inch thick, and ".012," which is twelve thousandths of an inch thick (hereafter ".008 steel" or ".012 steel" where applicable).

Piezo purchased .008 steel from Uddeholm throughout the 1970s. Piezo bought .012 steel from Uddeholm in the late 1970s. (Pl.'s Br.Opp.Summ.J. at 6; Defs.' Br. Supp.Summ.J. at 17.) The steel that Piezo purchased from Uddeholm during this period was a grade of steel called "UHB–20" (hereafter "UHB–20 steel"). (Pl.'s Br. Opp.Summ.J. at 6.) Piezo purchased .008 steel and .012 steel from other suppliers during the late 1970s and early 1980s, but continued to purchase other items produced by Uddeholm during these years. (Pl.'s Br. Opp.Summ.J. at 7.)

In April and August of 1985, a sales representative for Uddeholm visited Piezo's manufacturing plant in order to prepare price quotes for Piezo. (Pl.'s Appendix to Br. Opp.Summ.J. at 4, pg. 76.) Quotations associated with the visits specifically described "UHB 20" steel. (Pl.'s Appendix to Br. Opp.Summ.J. at 6, Ex. B.) Piezo resumed purchasing .008 steel from Uddeholm in March, 1986. It resumed purchasing .012 steel in 1989. Between March, 1986, and

December, 1990, Piezo placed at least five orders with Uddeholm and received deliveries of either .008 steel or .012 steel from Uddeholm on more than twelve occasions.

The pertinent paperwork involved in these transactions explicitly reflects that Piezo ordered UHB–20 steel. Documents generated by Uddeholm, which include Uddeholm's completed invoices, quotations, work order and order acknowledgment forms, almost uniformly represent that "UHB–20" steel was being sold by Uddeholm. (*See* copies attached to Pl.'s Appendix to Br. Opp.Summ.J. (Doc. Entry # 82) at Exhibits 6 through 11, 18, 22.) In addition to placing written purchase orders with Uddeholm, Piezo alleges that it placed at least one order for UHB–20 steel by telephone, which is confirmed by Uddeholm's records. (Pl.'s Br. Opp.Summ.J. at 15; Order copy attached to Pl.'s Appendix to Br.Opp.Summ.J. (Doc. Entry # 82) at 15.)[2] Piezo alleges that with each shipment of steel, its employees compared Piezo's purchase orders with Uddeholm's order acknowledgments, work orders and invoices, which, as explained above, represented that UHB–20 steel was delivered. (Pl.'s Br.Opp.Summ.J. at 11.)

Uddeholm, however, did not deliver UHB–20 steel to Piezo. Instead, it delivered a different grade of steel, called "UHB–20C" (hereafter "UHB–20C steel"), the significant difference between UHB–20 steel and UHB–20C steel apparently being that the surface of UHB–20C steel demonstrates "irregularities in the pattern of surface residual stresses" which do not exist in the surface of UHB–20 steel. (Pl.'s Br.Opp.Summ.J. at 18.) Uddeholm marked the outside of its containers carrying UHB–20C steel with blue tags which stated, *inter alia*, the description,

1. Defendant Randall Yates will be included in the collective reference "Uddeholm" where applicable, though he is not charged in all of the counts in Piezo's amended complaint. Defendant Uddeholm Strip Steel is a wholly owned subsidiary of defendant Uddeholms, A.B. Defendant Uddeholm Corporation is the American importer, distributor and vendor of the products manufactured by Uddeholms, A.B. and Uddeholm Strip Steel, A.B.

2. Piezo ordered steel from Uddeholm on the following dates, which do not include orders placed

by phone: March 10, 1986; September 30, 1987; January 6, 1989; and January 25, 1990. (*See* Defs.' Br.Supp.Summ.J. at 13, 16, 21; Pl.'s Br. Opp.Summ.J. at 8, 9, 10.) Piezo took delivery from Uddeholm on the following dates: March 14, 1986; April 24, 1986; October 21, 1987; December 10, 1987; April 17, 1989; August 4, 1989; November 2, 1989; January 18, 1990; April 12, 1990; May 29, 1990; July 27, 1990; October 29, 1990; December 19, 1990. (*See* Defs.' Br.Supp.Summ.J. at 15, 21; Pl.'s Br. Opp.Summ.J. at 9, 10.)

grade, and order number of the steel. The tags specifically stated that the steel was UHB–20C steel. Containers in which UHB–20 steel had been shipped had been marked with purple tags. The steel that Uddeholm delivered to Piezo between March, 1986, and December, 1990, was marked with blue tags.

It appears that Uddeholm did not explain that UHB–20C steel was different than UHB–20 steel.[3] Furthermore, as noted above, all documentation other than the blue tags represented that "UHB–20" steel was being delivered to Piezo.

Piezo received the first deliveries of UHB–20C steel in March and April of 1986. Between late 1986 and early 1987, significant problems were encountered with the production of the crystal wafers. Piezo investigated several different possible causes for the problems, ranging from human error to the quality of the quartz being cut. (Pl.'s Br. Opp.Summ.J. at 12–13.) Piezo's investigations, however, were hindered by the fact that the problems, which concerned the angles at which the crystal wafers were cut, did not occur consistently. (Pl.'s Br. Opp.Summ.J. at 45 n. 40.)

Between January and March of 1990, Piezo employees spoke with defendant Randall Yates, a sales representative for Uddeholm, concerning Uddeholm's inability to meet "straightness" specifications for .008 steel and .012 steel Piezo ordered in January, 1990.[4] The completed order forms for the January, 1990 order involved in these discussions include the specific designation "UHB–20 steel." (*See* copies attached to Pl.'s Appendix to Br.Opp.Summ.J. (Dkt. Entry # 82) at 15.) Yates' signature appears on Uddeholm's January, 1990 order acknowledgement form, which explicitly references UHB–20 steel. (*See* copies attached to Pl.'s Appendix

to Br.Opp.Summ.J. (Dkt. Entry # 82) at 18.) Following their discussions, Piezo and Yates subsequently changed the steel order to meet different specifications, and the change order forms also represent that "UHB–20 steel" was being delivered. Yates' signature appears on Piezo's change order forms to verify "Vendor Acceptance." (*See* copies attached to Pl.'s Appendix to Br.Opp.Summ.J. (Dkt. Entry # 82) at 18.) Yates' signature also appears on Uddeholm's order acknowledgement for the change order, which specifically states, "UHB–20 steel." However, an *internal* order form to the Uddeholm mill, which Yates initialed, refers to "UHB–20C" steel. (Pl.'s App. to Br.Opp.Summ.J. (Dkt. Entry # 82) at Ex. 19.) The March delivery to satisfy this change order was Uddeholm's final delivery of UHB–20C steel to Piezo. There is no indication that Yates informed any Piezo employee of any difference between UHB–20 and UHB–20C steel.[5]

On October 30, 1990, a business visitor to Piezo's manufacturing plant, Amos J. Shaler, Sc.D., suggested that Piezo's production problems could be caused by the fact that its saw blades were not made with UHB–20 steel. Piezo alleges that shortly thereafter it purchased steel from another supplier and its production problems disappeared. (Pl.'s Br. Opp.Summ.J. at 17.) Piezo notified Uddeholm in February of 1991 that it believed that Uddeholm steel had been the cause of problems in Piezo's production line. (Pl.'s Appendix to Br.Opp.Summ.J. (Doc. Entry # 82) at Ex. 20.)

Piezo filed a complaint on July 24, 1991, maintaining that its production problems were caused by the UHB–20C steel. In a January 21, 1992 Order, Chief Judge Rambo directed Piezo to file an amended complaint (Dkt. Entry # 14), and Piezo complied on

---

3. Uddeholm notes that in the months prior to Piezo's January, 1989 order of .012 steel, Piezo employees used .012 steel, which was UHB–20 type, that Piezo had purchased from Uddeholm in November, 1977, but which had been lying around on the floor of Piezo's production facility. (Defs.' Br.Supp.Summ.J. at 17–21.)

4. At that time, Piezo had not suspected that its crystal wafer production problems were attributable to the steel supplied by Uddeholm, which Piezo believed to be "UHB–20" steel.

5. Yates testified that at the time of the discussions with Piezo representatives in 1990 he was not aware of differences between UHB–20 and UHB–20C steel. He also testified that, as a result of this case, he learned that there were differences between UHB–20 and 20C steel. (Ex. 2 to App. to Defendant's Reply Brief in Support of Motion for Summary Judgment.)

February 10, 1992 (Dkt. Entry # 15). Piezo's amended complaint asserts claims of fraud and misrepresentation (Counts I and II), breach of contract (Count IV), and breach of express and implied warranties. (Count V and VI).[6] On October 7, 1993, following the completion of discovery, the defendants moved for summary judgment, assailing the merits of Piezo's claims and also asserting a statute of limitations defense. (Dkt. Entry # 70.)

## II. *DISCUSSION*

### *MOTION FOR SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment will not lie "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no issue for trial unless sufficient evidence exists which favors the non-moving party so that a jury may return a verdict for that party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510. Summary judgment thus should be entered when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

▇▇▇▇ The burden of demonstrating the absence of genuine issues of material fact

initially rests with the moving party regardless of which party would have the burden of persuasion at trial. *Celotex*, 477 U.S. at 321–25, 106 S.Ct. at 2552–54. After the moving party meets this burden, the non-moving party must make a factual showing as to every element essential to that party's case. *Id.* All doubts as to the existence of a genuine issues of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the non-moving party. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3rd Cir.1993); *Continental Insurance v. Bodie*, 682 F.2d 436 (3rd Cir.1982).

### *FRAUD AND MISREPRESENTATION*

▇▇▇▇ Pennsylvania law recognizes that an actionable claim of. fraud may be based upon a positive assertion as well as a failure to disclose. *See Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 613–14 (3rd Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992).[7] A prima facie case of fraudulent misrepresentation consists of the following elements: (1) a false representation of an existing fact, (2) an intention by the maker that the recipient will thereby be induced to act, (3) justifiable reliance by the recipient upon the misrepresentation, and (4) damage to the recipient as a proximate result. *Mellon Bank Corp. v. First Union Real Estate*, 951 F.2d 1399, 1409 (3rd Cir.1991); *Kinnel v. Mid–Atlantic Mausoleums, Inc.*, 850 F.2d 958, 963–64 (3rd Cir. 1988); *Smith v. Renaut*, 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); *Snell v. State Examining Board*, 490 Pa. 277, 281, 416 A.2d 468, 470 (1980). Under Pennsylvania law, it is the trial court's responsibility to determine whether the evidence presented by the plaintiff " 'is sufficiently clear, precise and convincing to make out a prima facie case.' " *Mellon Bank*, 951 F.2d at 1409.

▇▇▇▇ The first element of a fraud claim is established if a false statement of existing

6. By Memorandum and Order dated July 30, 1992, Chief Judge Rambo granted Uddeholm's February 28, 1992 motion to dismiss count three of the amended complaint, asserting a civil conspiracy claim, but denied Uddeholm's motion as to counts one and two, which allege fraud and misrepresentation. (Dkt. Entry # 23.)

7. The parties agree that Pennsylvania law applies in this diversity case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

fact was made knowingly, in conscious ignorance of the truth, or with reckless disregard of the truth or falsity of the statement. *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 107–08, 464 A.2d 1243, 1252 (1983). An innocently made misrepresentation is also actionable, however, provided that the misrepresentation "relate[d] to a matter material to the transaction involved." *Id.* at 108, 464 A.2d at 1252. *Accord, Hughes,* 945 F.2d at 614; *Smith,* 387 Pa.Super. at 305–06, 564 A.2d at 192. As explained in *Boyle v. Odell,* 413 Pa.Super. 562, 569–70, 605 A.2d 1260 (1992), innocently providing false information that is material to the transaction may be actionable if the defendant had the ability to know the truth before making the representation. A matter is material to the transaction when it is of such a character that it determines whether the transaction occurs. *See Delahanty,* 318 Pa.Super. at 107–08, 464 A.2d at 1252.[8]

■ Piezo has presented sufficient evidence on the first element of a claim for fraud. Despite the fact that Uddeholm had not produced UHB–20 steel in over a decade, Uddeholm documented in its invoices, work orders and order acknowledgment forms that it supplied UHB–20 steel as ordered by Piezo. Yates signed this documentation and conducted discussions with Piezo employees about a particular order for UHB–20 steel. These representations were false. Assuming that the misrepresentations were made innocently, they clearly related to a matter material to the transaction—the very grade of steel Piezo ordered—which alone can establish the misrepresentation element. *See Hughes,* 945 F.2d at 614; *Smith,* 387 Pa.Super. at 305–06, 564 A.2d at 192.

■ Sufficient evidence has also been presented to warrant submission to the jury of the question of whether Uddeholm's and Yates' misrepresentations were made in conscious ignorance of the truth or recklessly without caring whether they were true or false. *See Browne v. Maxfield,* 663 F.Supp. 1193, 1202 (E.D.Pa.1987); *Briggs v. Erie Ins. Group,* 406 Pa.Super. 560, 568, 594 A.2d 761, 764 (1991). Despite the fact that it had not manufactured UHB–20 steel in over a decade, Uddeholm accepted Piezo's purchase orders for UHB–20 steel and confirmed the orders by indicating that UHB–20 steel would be or had been delivered. Uddeholm then delivered UHB–20C steel. During the entire period between March, 1986, and December, 1990, no Uddeholm employee or representative, including Yates, informed Piezo that Uddeholm did not manufacture UHB–20 steel or that UHB–20C steel was not the same product as UHB–20 steel.

Uddeholm argues that there is no evidence to support a determination that it had fraudulently misrepresented that UHB–20 and UHB–20C steel were identical. Uddeholm asserts that the specifications stated by Piezo in its steel orders "expressly call for '*GANG BLADE MATERIAL FOR SLURRY SAW*' and referred to the steel grade as '*C1095 Carbon Steel* (UHB–20).' " (Defs.' Br. Supp.Summ.J. at 52 (emphasis added in Brief).)[9] Uddeholm argues that in ordering C1095 carbon steel, Piezo ordered general steel having a standard composition of the sort of steel used in slurry saws and that Uddeholm committed no fraud because it delivered steel which met that standard composition.

As explained above, however, documentation prepared by Uddeholm relating to the transactions almost uniformly represented that UHB–20 steel was ordered and delivered. Under these circumstances, a rational jury could infer that Uddeholm misrepresented that there was no difference between UHB–20 and UHB–20C steel.[10]

---

**8.** A "fraudulent utterance" of a misrepresentation is often listed as a separate element of the common law cause of action for fraud. Because, however, even an innocently-made misrepresentation of a material fact is actionable under Pennsylvania law, it is confusing to refer to the "state-of-mind" element of a fraud claim in terms of a "fraudulent utterance."

**9.** C1095 carbon steel apparently is a standard steel used in slurry saws. (Defs.' Br. Supp.Summ.J. at 57.) Both parties agree that Uddeholm delivered C1095 carbon steel; both parties also agree that Uddeholm delivered UHB–20C steel, which Piezo maintains differs qualitatively from UHB–20 steel.

**10.** A rational jury could make this finding even without considering the testimony of Charles

■ Sufficient evidence exists to show that Uddeholm intended to induce Piezo to act on the basis of the misrepresentations. The very fact that the parties acted in a business relationship whereby both expected to profit demonstrates intent on Uddeholm's part. As for Yates, his direct conversations with Piezo employees concerning an order for UHB–20 steel support an inference of intent to induce Piezo to act on the implicit representation that Uddeholm was supplying UHB–20 steel.

■ It cannot be said, as a matter of law, that Piezo's reliance upon representations that Uddeholm was supplying UHB–20 steel was unreasonable. In this regard, it is important that the differences which Piezo alleges exist between UHB–20 steel and UHB–20C steel are not visible to the naked eye. Furthermore, the history of transactions involving UHB–20 steel between Piezo and Uddeholm dating to the 1970s provided Piezo with grounds on which to justifiably rely that UHB–20 steel would be delivered by Uddeholm. *See Greenberg v. Tomlin,* 816 F.Supp. 1039, 1056 (E.D.Pa.1993).

■ Uddeholm argues that Piezo's reliance on the invoices and packing slips was unjustifiable in light of the fact that the containers carrying steel displayed blue tags which clearly identified UHB–20C steel. (Br.Supp.Summ.J. at 38.) Piezo counters by asserting that it was standard practice to confirm that Piezo received the products it had ordered by comparing order forms with packing slips and invoices, all of which represented that UHB–20 steel had been delivered. Under these circumstances, a rational jury could find it reasonable to rely upon the consistent representations made throughout Uddeholm's documentation. Therefore, with respect to the reliance element of Piezo's fraud claim, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.[11]

The record documents sufficient evidence to warrant submission of Piezo's claims of fraud and misrepresentation to a jury. Uddeholm therefore is not entitled to summary judgment. *See Moffatt Enterprises, Inc. v. Borden, Inc.,* 807 F.2d 1169, 1174–75 (3rd Cir.1986).

## BREACH OF CONTRACT

■ Piezo's breach of contract claims are bottomed on its assertion that although it ordered UHB–20 steel, Uddeholm delivered UHB–20C steel. Uddeholm, in moving for summary judgment notes that the specifications stated by Piezo in its steel orders "expressly call for '*GANG BLADE MATERIAL FOR SLURRY SAW*' and referred to the steel grade as '*C1095 Carbon Steel* (UHB–20).'" (Defs.' Br.Supp.Summ.J. at 52 (emphasis added in Brief).)[12] Both parties agree that Uddeholm delivered AISI 1095 carbon steel. Uddeholm argues that in ordering AISI 1095 carbon steel, Piezo ordered general steel having a standard composition of the sort of steel used in slurry saws and that Uddeholm delivered steel which met that standard composition. The issue thus is whether there is a genuine issue of fact as to whether Piezo's orders called for UHB–20 steel as opposed to any steel that met the general specifications for AISI 1095 carbon steel.

The interpretation of a contract ordinarily is a question of law for the courts and becomes a question for the finder of fact when, for instance, the contract is ambiguous. *Fox*

Jensik, Piezo's President—the admissibility of which Uddeholm vigorously disputes—that a Piezo employee (whose name Jensik cannot remember) contacted a Uddeholm representative (whose name Jensik also cannot remember) and was told that UHB–20 steel and UHB–20C steel were substantially the same. (*See* Pl.'s Br.Opp. Summ.J. at 14.) Although it is unnecessary to decide at this time the admissibility of Jensik's testimony, Uddeholm's objection appears to be well-founded. *See, e.g., Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 n. 16 (3rd Cir.1994).

11. As Piezo presents sufficient evidence that it suffered damage as a result of using the UHB–20C steel, which Uddeholm does not directly refute, this final element of the fraud claim is established.

12. There appears to be no dispute that "[t]he industry standard for gang blade material for slurry saws is 1% carbon steel known as AISI 1095 carbon steel according to the American Iron and Steel Institute (AISI) standard for composition of steel." (Defs.' Br.Supp.Summ.J. at 9.)

*v. United States Dep't of Housing,* 680 F.2d 315, 319 (3rd Cir.1982). The court determines whether the terms of a contract are unambiguous. *Griesmann v. Chemical Leaman Tank Lines, Inc.,* 776 F.2d 66, 72 n. 9 (3rd Cir.1985).

In this case, Piezo ordered "C1095 carbon steel (UHB–20)." It is not clear from the documents of record that "C1095 carbon steel (UHB–20)" refers to any steel that meets the AISI specifications or to a specific Uddeholm brand of steel that had been manufactured by Uddeholm in the 1970's and sold to Piezo. The fact that Uddeholm carries different product names for its AISI 1095 steel—UHB–20 and UHB–20C here— argues that Uddeholm itself recognizes that some difference exists between the two steels. Thus, one possible interpretation of Piezo's purchase orders for AISI 1095 UHB– 20 steel is that it did not order *any* AISI 1095 steel. Accordingly, it cannot be concluded as *a matter of law that Uddeholm* satisfied its contractual obligation by supplying steel that met the AISI specifications for gang blade material for slurry saws, but which Piezo contends is qualitatively different than UHB–20 steel.

Uddeholm also argues at great length that Piezo cannot present competent evidence to substantiate a claim that UHB–20C steel was materially different than UHB–20 steel. The Court finds, however, that reports and testimony of Piezo's expert, Dr. Shaler, are sufficient to withstand a summary judgment motion on this issue.

In short, there are genuine issues of fact as to whether Piezo's orders required delivery of UHB–20 steel and whether UHB–20C steel is materially different than UHB–20 steel. Accordingly, Uddeholm is not entitled to summary judgment on the theory that its contractual obligations were satisfied by supplying steel that conformed to the specifications for AISI 1095 carbon steel.

 Uddeholm also seeks summary judgment on Piezo's contract claims on the grounds that Piezo failed to provide notice of Uddeholm's alleged breach of contract in a timely manner. In support of this argument, Uddeholm argues that it is indisputable that Piezo was aware that it was receiving UHB–

20C steel in 1987 or 1988 when Jensik was informed that the delivered steel included tags identifying it as UHB–20C. Piezo counters by pointing to the uncontradicted evidence that differences between UHB–20 and UHB–20C steel cannot be discerned by unaided visual inspection and that each order acknowledgment, work order, packing slip, and invoice generated by Uddeholm represented that UHB–20 steel was being delivered. At a minimum, there is a question of fact as to whether Piezo knew or should have known by 1988 that it was not receiving the product it claims to have ordered.

Uddeholm also asserts that Piezo should have suspected that the steel used in the slurry saws was the cause of its production difficulties commencing in 1986 or 1987. Piezo counters by arguing that irregularities in the crystal wafers did not manifest themselves consistently, thus diverting attention from the saw blades.

A "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy." 13 Pa.C.S. § 2607(c)(1). "What is a reasonable time for taking any such action depends on the nature, purpose, and circumstances of such action." 13 Pa.C.S. § 1204(b). Consequently, what constitutes a reasonable time within which the buyer should have discovered any breach "has as many [possibilities] as there are fact patterns in the cases." *RAD Services, Inc. v. American Refining Group, Inc.,* 330 Pa.Super. 308, 312, 479 A.2d 565, 567 (1984). As explained in *RAD Services:*

> Whether a buyer discovers a breach and gives notice of it within a reasonable time is normally a jury question. Only under the situation where the facts are *undisputed* and the buyer *clearly* ought to have known of the alleged defect does the question of reasonableness become one for the court. *Id* at 312, 479 A.2d at 567 (emphasis added).

This case is not one where Piezo *clearly* should have known of the alleged breach prior to 1990. As discussed above, every document created by Uddeholm associated with the steel indicated that UHB–20 steel

was ordered and delivered. Piezo had not encountered production problems when it was using UHB–20 steel. Both parties agree that the alleged differences between UHB–20 steel and UHB–20C steel were invisible to the naked eye. In addition, Piezo's production problems did not appear consistently, (Pl.'s Br.Opp.Summ.J. at 45 fn. 40), so that Piezo's efforts to investigate the cause of its production problems were hampered. Under these circumstances, the facts do not compel the conclusion that, as a matter of law, Piezo should have reasonably discovered the alleged source of its problems prior to 1990. Accordingly, the question of whether Piezo notified Uddeholm of the alleged breach in a timely manner cannot be resolved by way of a summary judgment motion.[13]

## STATUTES OF LIMITATION DEFENSES

### A. Contract Claims

■ Piezo's contract claims are governed by 13 Pa.C.S. § 2725(a), which provides that an action for breach of any contract involving the sale of goods must be brought within four years after the cause of action accrued. Under 13 Pa.C.S.A. § 2725(b), "[a] cause of action accrues when the breach occurs, regardless of the aggrieved parties' lack of knowledge of the breach." Moreover, unless there exists a warranty explicitly covering the future performance of the goods and discovery of the breach must await the time of such performance, a cause of action for breach of warranty accrues "when tender of delivery is made." Id.

It is undisputed that steel shipped pursuant to Piezo's Purchase Order 10577 was received by Piezo in 1986. Accordingly,

claims for breach of contract and breach of warranty involving the steel delivered to Piezo under Purchase Order 10577 are time-barred. Uddeholm is therefore entitled to partial summary judgment with respect to Piezo's contractual claims concerning the steel supplied by Uddeholm pursuant to Purchase Order 10577.[14]

### B. Fraud Claims

■ Piezo's fraud claims are governed by a two year limitations period. See 42 Pa. C.S.A. § 5524(7). A cause of action for fraud accrues when "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." Bohus v. Beloff, 950 F.2d 919, 924 (3rd Cir.1991). Thus, if the injured party did not know of the injury or its cause despite exercising reasonable diligence, the limitations period does not begin to run until the party discovers or reasonably should have discovered the injury or its cause. Gurfein v. Sovereign Corp., 826 F.Supp. 890, 918 (E.D.Pa.1993); Pocono International Raceway, Inc. v. Pocono Produce, Inc., 503 Pa. 80, 85, 468 A.2d 468, 471 (1983).

■ In this case, there is sufficient evidence upon which a rational jury could premise conclusions that Piezo did not learn that the Uddeholm steel could be the cause of its production problems until 1990 and that Piezo had exercised due diligence in attempting to ascertain the cause of its production problems. Under these circumstances, Uddeholm is not entitled to summary judgment on the fraud and misrepresentation claims based upon the applicable statutes of limitations.[15]

---

13. Uddeholm argues that Piezo's right to revoke acceptance of the goods in question expired when Piezo cut the steel to fit in Piezo's slurry saws (Br.Supp.Summ.J. at 88–89). Regardless of the correctness of Uddeholm's position, damages still can be recovered where the plaintiff suffered harm from a latent defect before being able to discover it. See Intervale Steel Corp. v. Borg & Beck Division, Borg–Warner Corp., 578 F.Supp. 1081, 1086–87 (E.D.Mich.1984), aff'd, 762 F.2d 1008 (6th Cir.1985); In re Repco Products, 100 B.R. 184, 197–98 (Bkrtcy.E.D.Pa.1989). It is thus unnecessary to decide whether Piezo timely revoked acceptance of the goods under 13 Pa.C.S.A. § 2608.

14. Piezo did not contest the entry of summary judgment on its contract claims arising out of steel shipments made during 1986. By the same token, Uddeholm did not argue that contractual claims arising out of any other shipments of steel were time-barred.

15. The Court does agree, however, that Piezo has not presented sufficient evidence upon which a jury could conclude that Uddeholm should be estopped from asserting the statute of limitations defense. Jensik's testimony concerning a representation made by an unidentified Uddeholm employee to an unidentified Piezo employee does not provide a competent basis for a conclusion

### WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AND WARRANTY OF MERCHANTABILITY

 Count Five of the Amended Complaint alleged breach of express warranties pursuant to 13 Pa.C.S.A. § 2313 and breach of the implied warranty of merchantability pursuant to 13 Pa.C.S.A. § 2314. Uddeholm moved for partial summary judgment on Count Five, asserting that there are no disputed facts as to whether Uddeholm had breached the implied warranty of merchantability.

Count Six of the Amended Complaint alleged a breach of the warranty for a particular purpose under 13 Pa.C.S.A. § 2315. Uddeholm has moved for summary judgment on Count Six of the Amended Complaint, asserting that Piezo cannot present any evidence to support a claim for breach of the warranty of fitness for a particular purpose.

The warranty of merchantability requires goods to be "fit for the ordinary purposes for which such goods are used." 13 Pa.C.S.A. § 2314(b)(3); *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3rd Cir. 1992). The warranty of fitness for a particular purpose requires the "seller at the time of contracting [to have] reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods." 13 Pa.C.S.A. § 2315; *Schlier v. Milwaukee Elec. Tool Corp.*, 835 F.Supp. 839 (E.D.Pa.1993).

Piezo has not presented any evidence from which it may be inferred that the UHB–20C steel was not "fit for the ordinary purposes for which such goods are used." Piezo has also failed to present evidence that Uddeholm had reason to know at the time of sale that Piezo had a particular purpose for which the goods were required.[16] Accordingly, Uddeholm is entitled to summary judgment as a matter of law regarding Piezo's allegations of breach of the warranty of fitness for a particular purpose and the warranty of merchantability. *See Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 512–17 (7th Cir.1988).

An appropriate Order will be issued.

### ORDER

In accordance with the accompanying Memorandum, **IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. Entry # 70) is **GRANTED** with respect to (a) plaintiff's breach of contract claims concerning steel delivered to plaintiff pursuant to Purchase Order No. 10577; (b) plaintiff's claim of breach of the implied warranty of merchantability asserted in Count Five of the Amended Complaint; and (c) plaintiff's claim of breach of warranty of fitness for a particular purpose asserted in Count Six of the Amended Complaint.

2. In all other respects, defendants' Motion for Summary Judgment is **DENIED.**

---

that Uddeholm induced Piezo to sit on its rights. Piezo points to no other evidence of an affirmative act by Uddeholm intended to conceal its alleged fraud. Indeed, the fact that the containers of steel were labeled as "UHB–20C" is inconsistent with an effort to conceal the alleged fraudulent conduct.

**16.** Indeed, Piezo did not respond at all to Uddeholm's arguments concerning the propriety of summary judgment on the claims of breach of warranties of merchantability and fitness for a particular purpose. Instead, Piezo only addressed its express warranty claims asserted in Count Five, as to which Uddeholm did not seek summary judgment.